[No. E041364. Fourth Dist., Div. Two. Dec. 17, 2007.]

SAVE ROUND VALLEY ALLIANCE, Plaintiff and Appellant, v.
COUNTY OF INYO et al., Defendants and Respondents;
JIM WALTERS, Real Party in Interest and Respondent.

1438

COUNSEL

Shute, Mihaly & Weinberger, Tamara S. Galanter and Gabriel M. B. Ross for Plaintiff and Appellant.

Liebersbach, Mohun, Carney & Reed, James S. Reed; Paul N. Bruce, County Counsel, Randy H. Keller, Deputy County Counsel; Schilt and Heinrich and E. Nathan Schilt for Defendants and Respondents and for Real Party in Interest and Respondent.

OPINION

KING, J.—

## I. INTRODUCTION

This case concerns a plan to subdivide approximately 74 acres in Inyo County, near the base of Mt. Whitney, into twenty-seven 2.5-acre parcels for the development of single-family residences. The Board of Supervisors of the County of Inyo (Board) certified an environmental impact report (EIR) concerning the project and approved the developer's tentative tract map. Plaintiff Save Round Valley Alliance (SRVA) petitioned the superior court for a writ of mandate to vacate and set aside the Board's actions. The trial court denied the petition, and SRVA appealed.

SRVA contends that the EIR is inadequate because it describes the project as a 27-lot subdivision for single-family residences even though future owners of the lots might obtain permits to build second, smaller dwellings on the lots. As a result of this alleged misdescription, SRVA argues, the EIR persistently understates the project's environmental impacts. SRVA further contends that the EIR fails to adequately analyze a possible land exchange with the federal Bureau of Land Management as an alternative to the project. Finally, SRVA contends that the EIR fails to adequately analyze the project's impacts to special status species and visual impacts. We agree with SRVA that the analysis of the land exchange alternative is legally insufficient and reverse on that ground. We reject SRVA's other contentions.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Overview of the Project*

Real party in interest, Jim Walters, sought approval of a tentative tract map to subdivide approximately 74 acres in Inyo County into twenty-seven 2.5-acre parcels for the development of single-family residences. The property is located approximately four miles west of the community of Lone Pine, near the foothills of the Sierra Nevada mountain range. It is adjacent to Whitney Portal Road, which connects Lone Pine to the trailhead for Mt. Whitney, the highest mountain in the contiguous 48 states.

To the east, south, and west, the property adjoins undeveloped open space owned by government entities. To the north, across Whitney Portal Road, there are privately owned parcels ranging from 2.5 acres to 20 acres. Some of these parcels are improved with single-family homes. The nearest residential subdivision is located approximately three miles to the southeast.

Nine of the lots would be accessed directly from Whitney Portal Road. The remaining lots would be accessed from either of two roads connecting Whitney Portal Road with one internal road. Three gullies cross the site carrying water intermittently after heavy spring snowmelts and intense thunderstorms. The lots would be serviced by individual water wells and septic systems.

The property is designated in the Inyo County general plan as rural residential medium density, and zoned rural residential, with a 2.5-acre minimum. Both the general plan designation and the zoning classification restrict the use of the property to a maximum of one dwelling unit per 2.5 acres. (Inyo County Code, §§ 18.21.020A, 18.21.050B, 18.78.055.)[1] The project is consistent with the general plan and Inyo County's zoning ordinances.

The subdivision would be governed by extensive covenants, conditions, and restrictions (CC&R's), administered and enforced by a homeowners association. Under the CC&R's, lots may not be used for any purpose "other than a single-family home," and "[a]ll development shall be in compliance with single-family residential development standards of the County . . . ." Houses must be at least 1,600 square feet. The developable areas of each lot, or building envelope, is restricted to 27 percent of lot area for "non-equestrian lots" and 40 percent of lot area for "equestrian lots." Height restrictions range from 22 feet for lots adjacent to Whitney Portal Road to 30 feet for other lots. Roofs must be made of clay-fired flat tile, slate, nonreflective metal, or composition. Light fixtures must comply with a "dark skies" policy mandating that lights be fully shielded and attached to structures, and restricted in number, intensity of wattage, and duration of use. No lights will be allowed on the eastern and western edges of the subdivision. The CC&R's also address landscaping, setback requirements, a drainage and habitat preservation area, building materials, the construction of a park, septic and water systems, and underground utility lines. According to the CC&R's, a violation of its provisions constitutes a nuisance.

B. *The EIR*

The County of Inyo (County) determined that an EIR was required for the project in accordance with the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.). The Inyo County Planning Commission (Planning Commission) was designated the lead agency with authority to certify the EIR. In November 2004, the County published a draft environmental impact report (DEIR) for the project.

---

[1] We take judicial notice of the applicable Inyo County Code sections. (Evid. Code, §§ 452, subds. (b), (h), 459, subd. (a).)

The DEIR includes a description of the project generally as set out above. The stated objective of the project is "to develop the property in full compliance with the existing Inyo County General Plan designation for the property . . . with 1 dwelling unit per 2.5 acres allowed . . . ."

In the DEIR, the County concluded that, with one exception, significant impacts associated with the project can be mitigated to a level that makes them less than significant. The one exception is the impact on aesthetics; that is, the visual impact of the project on the surrounding landscape. The portion of the DEIR addressing aesthetic impacts of the project states: "The proposed project would locate a subdivision within an area currently existing as undeveloped land that provides sweeping, unbroken vistas across wide expanses of the valley to the Sierras. In addition, the proposed project would locate development adjacent to the only road leading to the Mt. Whitney trailhead and recreation area, a famous and exceptional environmental area and landscape feature. Thus, a high volume of tourist traffic . . . traveling to the Mt. Whitney recreation area would experience development along a major route which before existed as a natural landscape notable for its expansive view sheds and scenic beauty. The proposed subdivision thus would have a substantial adverse effect on scenic vistas, substantially degrade the existing visual character of the site."

According to the DEIR, restrictions in the CC&R's on structure heights, lighting, and other aspects of the development are "very good mitigation measures against impacts to the visual resources of the project area. However, development—however managed and buffered—cannot mitigate for the fact of constructing a subdivision where previously there was natural open landscape, with exceptional views, in a [renowned] environmental area. As a result, visual impacts to the environment from the proposed project remain at a significant and unavoidable level."

Where relevant, other environmental impacts identified in the DEIR, and the analysis of alternatives to the project, will be addressed below.

The DEIR was made available for public review and comment. The written comments and the County's responses thereto are included in the final environmental impact report (FEIR). The FEIR also includes appendices containing additional studies, reports, and other supplemental materials. We refer to the DEIR and the FEIR collectively as the EIR.

Following a public hearing, the Planning Commission adopted the EIR, certified that the requirements of CEQA had been satisfied, and approved the tentative tract map for the project.

SRVA appealed the Planning Commission's decision to the Board. Following a public hearing, the Board issued resolution No. 2005-36, by which it

denied the appeal, certified the EIR, and approved the project. The resolution included a statement of overriding considerations, which expressed the Board's conclusion that the beneficial economic activity and the addition of residential development outweighs the unavoidable environmental impacts of the project.

SRVA petitioned the superior court for a writ of mandate to vacate resolution No. 2005-36 and prohibit any action to implement the project. Following a hearing, the court denied the petition. SRVA appealed to this court.

## III. ANALYSIS

### A. *Standard of Review*

■ "The foremost principle under CEQA is that the Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' [Citation.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights*).) "The EIR is the primary means of achieving the Legislature's considered declaration that it is the policy of this state to 'take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state.' [Citation.] The EIR is therefore 'the heart of CEQA.' [Citations.] An EIR is an 'environmental "alarm bell" whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return.' [Citations.] The EIR is also intended 'to demonstrate to an apprehensive citizenry that the agency has, in fact, analyzed and considered the ecological implications of its action.' [Citations.] Because the EIR must be certified or rejected by public officials, it is a document of accountability. If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees. [Citations.] The EIR process protects not only the environment but also informed self-government." (*Id.* at p. 392.)

In a case challenging an agency's compliance with CEQA, we review the agency's action, not the trial court's decision. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426–427 [53 Cal.Rptr.3d 821, 150 P.3d 709].) In doing so, our "inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial

evidence." (Pub. Resources Code, § 21168.5; see also *Vineyard Area Citizens for Responsible Growth, Inc., supra*, at pp. 426–427.) Substantial evidence in this context means "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Cal. Code Regs., tit. 14, § 15384, subd. (a).)[2]

We do not review the correctness of the EIR's environmental conclusions, but only its sufficiency as an informative document. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161] (*Goleta Valley*).) "We may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. 'Our limited function is consistent with the principle that "The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations." ' [Citation.] We may not, in sum, substitute our judgment for that of the people and their local representatives. We can and must, however, scrupulously enforce all legislatively mandated CEQA requirements." (*Ibid.*)

## B. *Adequacy of the Project Description*

As is relevant to this discussion, the project is described as the subdivision of a 74-acre parcel of land into twenty-seven 2.5-acre lots on which future lot owners can build one single-family residence in accordance with the County's general plan, the applicable rural residential zoning classification, and the governing CC&R's. However, under the County's zoning ordinances, the owner of land designated rural residential can apply for a conditional use permit to build, among other structures, a social hall, a lodge, a community club, a country club, a swimming pool, a golf course, a residential care facility, a rest home, a sanitarium, a nursery school, a daycare center, a kennel, or *a second dwelling unit.* (Inyo County Code, § 18.21.040.) If each of the 27 future lot owners apply for and obtain a permit to build, and do build, a second dwelling unit, then the subdivision would hold 54 dwelling units. This possibility is not mentioned in the project description portion of the DEIR.

In its comments on the DEIR, SRVA asserted that the document mischaracterizes the project as a 27-lot, single-family residence development when the potential number of dwelling units is 54. In response to SRVA's comments, the County stated: "The project proposal is for a 27-lot subdivision. However,

[2] California Code of Regulations, title 14, section 15000 et seq. (Guidelines).

it is extremely unlikely that all homeowners would elect to add a second dwelling unit to their homes and there is no proposal to do so. A buildout of 54 units is at best a remote possibility and does not merit substantial evaluation."

On appeal, SRVA repeats its contention that "the EIR should have treated the Project as a 54-unit development" because future lot owners might build second dwelling units on their lots.[3] The failure to include this possibility in the project description, SRVA contends, leads the EIR to underestimate the project's visual impacts and impacts related to storm water runoff, traffic, air quality, and public services.[4] For the reasons that follow, we conclude that the decision to describe the project without reference to the possibility of second dwelling units was not an abuse of discretion.

 An EIR must include an accurate description of the project. (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 199 [139 Cal.Rptr. 396].) "Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal (i.e., the 'no project' alternative) and weigh other alternatives in the balance. An accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR." (*Id.* at pp. 192–193.) The description should not, however, "supply extensive detail beyond that needed for evaluation and review of the environment impact." (Guidelines, § 15124.)[5]

 CEQA defines a "project" to include, among other requirements, "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment." (Pub. Resources Code, § 21065; see also Guidelines, § 15378, subd. (a).)

---

[3] SRVA does not contend that the EIR must consider the possibility that a property owner will build a "social hall," or any of the other structures for which a conditional use permit can be sought. (See Inyo County Code, § 18.21.040.)

[4] Although the possibility that lot owners might obtain approval for, and build, a second dwelling unit is not mentioned in the project description in the DEIR, it is considered in the analysis of various environmental impacts. With respect to hydrology and water quality impacts, for example, water usage for the subdivision was based upon the assumption that the project could result in 54 homes on the 27 lots. The section addressing transportation and traffic impacts states the subdivision would generate 258 daily vehicle trips along Whitney Portal Road and was based upon an assumption of "twenty-seven residential units, or one for each proposed lot." The document goes on to note that this "daily trip generation figure is likely to increase" if second units are built on the lots. In a section of the DEIR addressing "growth-inducing impacts," the DEIR describes the project as "a 27 lot residential subdivision, with potential for 54 dwelling units if full build-out is realized . . . ."

[5] "[C]ourts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA." (*Laurel Heights, supra,* 47 Cal.3d at p. 391, fn. 2.)

When an initial project may involve future expansion, the EIR for the project must analyze such expansion if it will likely change the scope or nature of the initial project or its environmental effect and the expansion "*is a reasonably foreseeable consequence of the initial project*." (*Laurel Heights, supra,* 47 Cal.3d at p. 396, italics added; see also *Sierra Club v. West Side Irrigation Dist.* (2005) 128 Cal.App.4th 690, 698 [27 Cal.Rptr.3d 223].) Conversely, when future development is unspecified and uncertain, the EIR is not required to include speculation about future environmental consequences of such development. (*Laurel Heights, supra,* at p. 395; *National Parks & Conservation Assn. v. County of Riverside* (1996) 42 Cal.App.4th 1505, 1515 [50 Cal.Rptr.2d 339]; *Lake County Energy Council v. County of Lake* (1977) 70 Cal.App.3d 851, 854–855 [139 Cal.Rptr. 176]; see also Guidelines, § 15064, subd. (d)(3) ["A change which is speculative or unlikely to occur is not reasonably foreseeable"].)

■ SRVA asserts that future lot owners will have a right to build a second dwelling on the lots as a matter of state law, and refers us to Government Code section 65852.2. This section was enacted to prevent arbitrary, excessive, or burdensome restrictions on the ability of homeowners to build second units on their property. (Gov. Code, § 65852.150.) The statute gives local agencies, such as counties, three options with respect to regulating the construction of second dwelling units. The county may: (1) adopt an ordinance under Government Code section 65852.2, subdivision (a) that allows for the creation of second dwelling units subject to criteria and conditions set by the county; (2) ban all such units if it makes certain findings that the units would have specific adverse impacts on public health, safety, and welfare; or (3) pass no ordinance regarding second dwelling units. (See *Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 339–340 [25 Cal.Rptr.2d 842]; *Harris v. City of Costa Mesa* (1994) 25 Cal.App.4th 963, 967–968 [31 Cal.Rptr.2d 1].) SRVA argues that the County selected the no ordinance option and that *subdivision (b)* of Government Code section 65852.2 governs in this case. However, the County has enacted an ordinance providing for the creation of second dwelling units; thus subdivision (a) of Government Code section 65852.2, not subdivision (b), controls. (See Inyo County Code, § 18.78.340.)[6]

---

[6] The Inyo County ordinance provides that if a conditional use permit for a second dwelling unit is granted, it shall be subject to certain conditions, including: (1) the second unit cannot be offered for sale (although it may be rented); (2) if the unit is attached to the existing residence, the increase in floor space may not exceed 30 percent of the floor space of the existing residence; (3) a detached unit may not exceed 1,200 square feet; (4) the second unit must conform to applicable height, setback, lot coverage, architectural review, site plan review, and other zoning applicable requirements; (5) the unit must comply with applicable building code requirements; (6) at least two onsite, offstreet parking spaces are provided; and (7) any other conditions or requirements that the Planning Commission deems necessary to ensure that the

The Inyo County ordinance provides the Planning Commission with discretionary decisionmaking authority regarding any application for a second dwelling unit. (Inyo County Code, § 18.78.340D.) SRVA contends, however, that such discretionary authority has been superseded by conflicting provisions of Government Code section 65852.2, which provide that applications for second dwelling units must be considered ministerially without discretionary review. (See Gov. Code, § 65852.2, subds. (a)(3), (b)(1).) We need not decide this issue, however, because regardless of whether the Planning Commission retains discretionary authority concerning second dwelling unit applications, the possibility that future lot owners will or will not build a second unit is extremely uncertain, and any impact of such second units is highly speculative.

Whether a conditional use permit to build a second unit will ever be sought depends initially upon the desires of future lot owners, who are unknown. Although a conditional use permit can be sought for a second unit, there is no factual basis for believing that a future lot owner is likely to do so. Any conclusions about their intentions to build second units would therefore be pure speculation. There is simply nothing in the record (other than SRVA's speculative comment) to remotely suggest that any future lot owner would ever desire to build a second unit. Nor does the proposed tentative tract map or the CC&R's suggest the possibility of building second units. Indeed, regardless of the possibility of obtaining a conditional use permit, a lot owner would likely be discouraged, if not precluded, from building a second dwelling unit by the limitation in the CC&R's to building only "a single family home." Finally, even if the building of some second units might be foreseeable, it is impossible to predict how many units will be built, the size of such units, on which lots they might be built, their location within a lot, the visibility of a second unit from outside the subdivision, or how such units might impact the environment. (Cf. *Friends of the Sierra Railroad v. Tuolumne Park & Recreation Dist.* (2007) 147 Cal.App.4th 643, 651, 657 [54 Cal.Rptr.3d 500] [even though prediction of *some* future development was not speculative, EIR was not required when there were "no specific plans . . . on the table"].) In light of such uncertainty and unpredictability, we conclude the County acted well within its discretion in describing the project without reference to the possibility that future owners will build second dwelling units on the lots.

SRVA asserts that the decision to omit any reference in the project description of the possibility that future owners will build second units must be supported by substantial evidence in the record; that is, the Board must point to evidence to establish that the possibility of building second units,

second unit will neither adversely affect the health or safety of persons living or working in the vicinity nor be materially detrimental to public welfare. (Inyo County Code, § 18.78.340C.)

however speculative, is not foreseeable. In this context, however, the proper test is whether there is "credible and substantial evidence" that the possible expansion of the project asserted by SRVA "is a reasonably foreseeable consequence of the initial project." (*Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 738 & fn. 15 [270 Cal.Rptr. 650] (*Kings County*).) The record discloses no such evidence. Indeed, an appropriate response to a suggestion that the project description include possible future uses based entirely upon speculation is to simply reject such speculation as such; no reports, studies, or expert opinions are required to reject baseless assertions. (See *Chaparral Greens v. City of Chula Vista* (1996) 50 Cal.App.4th 1134, 1145 [58 Cal.Rptr.2d 152] ["Agencies are not required to engage in 'sheer speculation' as to future environmental consequences of the project"].) This is, in substance and effect, what the County did when it concluded that SRVA's 54-unit supposition was "at best a remote possibility [that] does not merit substantial evaluation."[7]

■ SRVA asserts that "[c]ase after case holds that CEQA requires that this EIR analyze the impacts of a 54-unit development." The cases relied on by SRVA, however, are distinguishable or inapposite. SRVA refers to *Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263 [118 Cal.Rptr. 249, 529 P.2d 1017], for the proposition that "an EIR must examine a project's *potential* to impact the environment, even if the development may not ultimately materialize." This does not mean, however, that a potential impact, no matter how speculative, must be considered in an EIR. *Bozung* concerned the annexation of 677 acres of land by the City of Camarillo. (*Id.* at p. 268.) The court concluded that an EIR was required. The court explained: "Vital to our disposition of this case is that [the real party in interest's] application stated that the land was presently used for agriculture and would be used 'for residential, commercial and recreational uses,' and that *such development was 'anticipated . . . in the near future.'* " (*Id.* at pp. 269–270, italics added.) By contrast, there is no basis other than pure speculation for anticipating that any future owners of the lots created by the subdivision in this case will seek or obtain permits to build second units.

SRVA also relies upon *San Franciscans for Reasonable Growth v. City and County of San Francisco* (1984) 151 Cal.App.3d 61 [198 Cal.Rptr. 634] (*San Franciscans for Reasonable Growth*). In that case, the court addressed the adequacy of an EIR that failed to consider the cumulative impacts of the

---

[7] Even if the building of second dwelling units on the lots was foreseeable and the project should have been described as a 54-unit development, SRVA's argument concerning the adequacy of the EIR with respect to storm water runoff is without merit. The EIR's analysis of storm water runoff was based upon the size and location of the building envelopes, not the number of structures on the lots. Even if second units are built on the lots, they must be built within the building envelopes. Thus, the number of units on the lot would have no effect on the storm water runoff analysis.

projects (the construction of certain office buildings in San Francisco) and "closely related projects . . . currently under environmental review" (other office buildings). (*Id.* at p. 74 & fn. 13.) As the court noted, an adequate cumulative analysis requires a list of " 'closely related past, present, and reasonabl[y] foreseeable probable future projects.' " (*Id.* at p. 73, quoting Guidelines, § 15023.5, subd. (b).) In holding that the EIR's were inadequate, the Court of Appeal explained: "experience and common sense indicate that projects which are under review are 'reasonabl[y] foreseeable probable future projects.' A significant investment of time, money and technical planning in the construction of a high-rise office building has necessarily occurred before a project is even submitted to the [city's office of environmental review] for initial review. . . . Ordinarily an office building project that is awaiting environmental approval has reached a stage of development where the developer, financial institutions, and contractors almost certainly view its construction to be a very real probability, and not without reason." (*San Franciscans for Reasonable Growth, supra,* at p. 75.) The speculative possibility that owners of the subdivided lots will seek to build second dwelling units in the present case cannot reasonably be analogized to the proposed office buildings omitted in the EIR's in *San Franciscans for Reasonable Growth.* Here, there is not even an owner of the proposed subdivided lots, let alone any investment of time, money, or planning by an owner to build a second unit on a lot.

SRVA cites to *City of Carmel-by-the-Sea v. Board of Supervisors* (1986) 183 Cal.App.3d 229 [227 Cal.Rptr. 899] (*Carmel-by-the-Sea*), for the proposition that the scope of the project encompasses any potential for expanded use of the property even if there are no current plans to fulfill that potential. In that case, property owned by a hotel was rezoned to allow for the expansion of the hotel. The hotel argued that an EIR was not required because its rezoning application " 'made no new or expanded commitment to the use of the property.' " (*Id.* at p. 243.) The Court of Appeal found this argument "disingenuous in light of the fact that during the course of the hearings it became evident that development was planned on the [hotel's] property, for which the rezoning was the first step." (*Ibid.,* fn. omitted.) The court noted that despite publicly asserting that no development was in the offing, the hotel submitted a use permit application proposing a development of 61 units a little over one week after the property was rezoned. (*Id.* at pp. 243–244, fn. 7.) Indeed, the rezoning resolution included a reference to the hotel's proposed development. (*Id.* at p. 244.) The rezoning application was thus not merely an effort to bring the existing hotel into compliance with zoning laws, "but was a necessary first step to approval of a specific development project." (*Ibid.*) A fair reading of the case does not support the broad proposition SRVA attributes to it. Moreover, it is easily distinguishable from the present case: there is nothing in the record before us to suggest that the approval of

the tentative tract map was sought as a necessary first step to the approval of second units by future owners.

In *Christward Ministry v. Superior Court* (1986) 184 Cal.App.3d 180 [228 Cal.Rptr. 868] (*Christward Ministry*), relied upon by SRVA, the Court of Appeal held that an EIR was required for a proposed general plan amendment that would authorize potential new uses for a solid waste management facility. (*Id.* at p. 190.) The court acknowledged the rule "that where future development is unspecified and uncertain, no purpose can be served by requiring an EIR to engage in sheer speculation as to future environmental consequences." (*Id.* at p. 193.) However, the court explained that in the case before it, "it can hardly be said future projects were 'unknown' or merely speculative. Our review of the administrative record leads us to the conclusion the general plan amendment here was adopted not merely to comply with state law in the abstract but as a necessary first step to approval of these 'unknown,' uncertain-to-occur future projects. This conclusion is based on the numerous comments addressed to the City council expressing concern about approval of a trash-to-energy plan. The representative of the company desiring to build this plant was one of the speakers at the hearing and has filed an amicus brief on appeal. The planning director noted an EIR for the proposed trash to energy plan had been in progress since August 1983, and stated the amendment would allow the City 'to appropriately review and assess any future projects such as the trash to energy project or a proposed methane extraction project . . . .' Both of these allegedly 'speculative' future projects were, in fact, approved within seven months of the general plan amendment." (*Id.* at p. 195.) *Christward Ministry* is thus distinguishable for the same reason that *Carmel-by-the-Sea* is distinguishable. Unlike the record in *Christward Ministry*, the record in the present case does not suggest the challenged approval was a necessary first step to the building of second units by future owners. To the contrary, the record is clear that the objective of the project is to create lots for single-family residences only.

*City of Redlands v. County of San Bernardino* (2002) 96 Cal.App.4th 398 [117 Cal.Rptr.2d 582] (*City of Redlands*), is also cited by SRVA for the assertion that an EIR must take into account future development permitted by the challenged action. *City of Redlands*, like *Christward Ministry*, involved the amendment of the county's general plan following the adoption of a negative declaration. Quoting *Christward Ministry*, this court stated that " 'an evaluation of a "first phase-general plan amendment" must necessarily include a consideration of the larger project, i.e., the future development permitted by the amendment.' " (*City of Redlands, supra*, at p. 409.) The court then goes on to state that the "record indicates that the County has failed to consider . . . *reasonably anticipated* future development." (*Ibid.*, italics added.) Moreover, the record "clearly indicates the existence of not

only potential future development, but at least one existing project undergoing separate environmental review." (*Ibid.*) *City of Redlands* does not, as SRVA suggests, support the proposition that any potential development, no matter how remote or speculative, must be addressed in an EIR.

Finally, SRVA cites *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645 [57 Cal.Rptr.3d 663] (*San Joaquin Raptor Rescue Center*), for the proposition that a project description "must include all of the activity allowed under the permit" that is the subject of the EIR. In that case, the owner of a mine sought a conditional use permit to expand the size of the mine's operations. (*Id.* at p. 650.) According to the DEIR, the expansion would not substantially increase production at the mine—raising the average annual production from 240,000 tons to 260,000 tons. (*Id.* at pp. 650–651, 655.) However, the desired permit would actually allow for production of up to 550,000 tons of material per year. (*Id.* at p. 655.) Moreover, this maximum was not merely a speculative possibility; rather the DEIR indicated "that there *will be* 500,000-ton production years." (*Id.* at p. 656, fn. 4, italics added.) The project description was thus "fundamentally inadequate and misleading." (*Id.* at p. 656.) Unlike the maximum mining production in that case, there is no suggestion in the DEIR in this case that future lot owners will build second dwelling units.

We therefore reject SRVA's argument and conclude that the County acted within its discretion in omitting from the project description the possibility that future lot owners might build second dwelling units.

C. *The Adequacy of the Discussion of Project Alternatives*

SRVA contends that the County failed to adequately consider alternatives that would have avoided the project's visual impacts. In particular, SRVA argues that the EIR failed to adequately analyze a possible land exchange with the federal Bureau of Land Management (BLM). We agree.

1. *The County's Discussion of Project Alternatives in the EIR*

The DEIR includes a discussion of alternatives to the project, including a "no project" alternative (i.e., denying approval for the project and allowing the land to remain vacant), developing different property acquired through a land exchange with a government entity, increasing the lot size from 2.5 acres to 5 acres, creating a community-based water and sewage system, and "clustered" housing with some units priced for low to moderate income levels.

The DEIR states that the "no project" alternative is "the environmentally superior alternative. However, this alternative is not practical in that it would

preclude achieving any of the project objectives." A land exchange is identified as the next superior alternative. However, the DEIR concludes that "this alternative is impractical because the potential exchanges discussed are not equitable, either to the project applicant or to the public agency involved." With respect to a possible land exchange with the BLM, the DEIR states that representatives of the BLM "judged that the project site land contained no particularly unusual or superior environmental habitat or characteristics which would make it a candidate for a land exchange with" the BLM.

In response to the DEIR, Bill Dunkelberger, a BLM field manager, submitted a letter in which he addressed the notion that the BLM was not interested in an exchange for Walters's property. Dunkelberger explained, among other points, that Walters "indicated that the BLM did not have any properties that he was interested in and he was not interested in a land exchange. BLM deals with willing sellers only." Dunkelberger further explained that because of the "impending development proposal, there appeared to be a high probability that the appraised value for the private property either could not be justified by the BLM for exchange, or the property owner would not accept the BLM appraised value for basis of exchange." Dunkelberger concluded, "It is difficult for BLM to discuss potential land exchanges with a proponent after a development proposal has already been processed by the county. The ideal time for discussion of a potential land exchange with any landowner is prior to any development application and significant planning or expenditure of funds. However, had Mr. Walters expressed interest in a potential land exchange at any time, BLM certainly would have entertained it."

The County included in the FEIR a map showing the location of the BLM parcel. The map is not topographical or drawn to scale, and does not indicate any physical characteristics of the property. It merely shows its juxtaposition to certain roads and its proximity to another subdivision. The only description of the BLM parcel is that it is approximately 100 acres, "near the Alabama Hills subdivision, approximately 3-1/2 miles outside Lone Pine, located north of Lubken Canyon Road between Horseshoe Meadows Road and Tuttle Creek Road."

The FEIR also includes a two-page report apparently written by Walters. In this report, Walters stated that a BLM representative informed him that a land exchange "is a long, involved process that takes years." He further stated that the BLM parcel is not acceptable to him because it "does not come close to possessing the amenities enjoyed by my 74 acres—e.g., view, proximity to running water, appropriate zoning." He concludes: "The upshot is that I have pursued any possible lead for an exchange of my 74 acres for comparable BLM property, and have found nothing that is feasible."

In response to Dunkelberger's comments, the County stated: "Land exchange consultations took place in the spring and summer of 2004, before the scoping meeting or DEIR preparation and before the project application was deemed complete by the County. Both the applicant and BLM concluded that no lands were available that were comparable in both quality and price to that of the project site."

SRVA, in its comments to the DEIR, criticized the analysis of project alternatives. Among other points, SRVA stated that the analysis was inadequate because it failed "to provide sufficient information to allow for meaningful evaluation and comparison with the proposed project."

In response to SRVA's comments, the County stated that none of the alternative parcels had a comparable view or a location near a watercourse—features that Walters identified as "integral to his project." Regarding a land exchange with the BLM, the County stated that the alternative parcel was "inferior to the applicant's parcel due to aesthetic/view issues. In addition, the property was designated as State and Federal Lands and not for residential development. Compared with the proposed Whitney Portal parcel, the applicant could not expect to achieve the same project or economic objectives with this offered parcel." For these conclusions, the County relied upon Dunkelberger's comments to the DEIR, the map of the BLM parcel, and Walters's determination "that the proposed land exchange options presented were inferior to the project site either in terms of size, location, or visual quality."

### 2. *Analysis*

■ "A major function of an EIR 'is to ensure that all reasonable alternatives to proposed projects are thoroughly assessed by the responsible official.' [Citation.]" (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 735 [32 Cal.Rptr.2d 704]; see Pub. Resources Code, § 21002.1, subd. (a) [purpose of EIR includes identifying alternatives to the project].) The Guidelines explain that the EIR "shall describe a range of reasonable alternatives to the project, or *to the location of the project*, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives. An EIR need not consider every conceivable alternative to a project. Rather it must consider a reasonable range of potentially feasible alternatives that will foster informed decisionmaking and public participation. An EIR is not required to consider alternatives which are infeasible." (Guidelines, § 15126.6, subd. (a), italics added.) "A potential alternative should not be excluded from consideration merely because it 'would impede to some degree the attainment

of the project objectives, or would be more costly.' " (*Preservation Action Council v. City of San Jose* (2006) 141 Cal.App.4th 1336, 1354 [46 Cal.Rptr.3d 902], quoting Guidelines, § 15126.6, subd. (b).)

■ "In determining the nature and scope of alternatives to be examined in an EIR, . . . local agencies shall be guided by the doctrine of 'feasibility.' " (*Goleta Valley, supra*, 52 Cal.3d at p. 565.) "Feasible," in this context, means "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (Pub. Resources Code, § 21061.1; see *Goleta Valley, supra*, at p. 565.) According to the Guidelines, appropriate factors for determining "the feasibility of alternatives are site suitability, economic viability, availability of infrastructure, general plan consistency, other plans or regulatory limitations, jurisdictional boundaries (projects with a regionally significant impact should consider the regional context), and whether the proponent can reasonably acquire, control or otherwise have access to the alternative site . . . ." (Guidelines, § 15126.6, subd. (f)(1).) Even when the project proponent does not own a potential alternative site, the development of the project on the alternative site may nevertheless be feasible when the alternative site can be acquired through a land exchange with a public entity. (See *Goleta Valley, supra*, at p. 575; *San Bernardino Valley Audubon Society, Inc. v. County of San Bernardino* (1984) 155 Cal.App.3d 738, 745 [202 Cal.Rptr. 423].) Federal law generally permits such exchanges involving federally owned land when "the public interest will be well served by making that exchange." (43 U.S.C. § 1716(a).)[8]

■ A local agency must make an initial determination as to which alternatives are feasible and which are not. (*Goleta Valley, supra*, 52 Cal.3d at p. 569.) If an alternative is identified as at least potentially feasible, an in-depth discussion is required. (*Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1504–1505, fn. 5 [19 Cal.Rptr.3d 1].) On the other hand, when the infeasibility of an alternative is readily apparent, it "need not be extensively considered." (*Goleta Valley, supra*, at p. 574.)

---

[8] With respect to land exchanges involving land owned by the federal government, Congress has declared: "(1) land exchanges are a very important tool for Federal and State land managers and private landowners to consolidate Federal, State, and private holdings of land or interests in land for purposes of more efficient management and to secure important objectives including the protection of fish and wildlife habitat and aesthetic values; the enhancement of recreation opportunities; the consolidation of mineral and timber holdings for more logical and efficient development; the expansion of communities; the promotion of multiple-use values; and fulfillment of public needs; [¶] (2) needs for land ownership adjustments and consolidation consistently outpace available funding for land purchases by the Federal Government and thereby make land exchanges an increasingly important method of land acquisition and consolidation for both Federal and State land managers and private landowners . . . ." (Pub.L. No. 100-409 (Aug. 20, 1988) § 2, 102 Stat. 1086.)

Even as to alternatives that are rejected, however, the "EIR must explain why each suggested alternative either does not satisfy the goals of the proposed project, does not offer substantial environmental advantages[,] or cannot be accomplished." (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus, supra,* 27 Cal.App.4th at p. 737; see Guidelines, § 15091, subd. (c) [when an agency finds that alternatives are infeasible, it must "describe the specific reasons for rejecting" the alternatives].) The explanation must be sufficient to enable meaningful public participation and criticism. (*Stand Tall on Principles v. Shasta Union High Sch. Dist.* (1991) 235 Cal.App.3d 772, 786 [1 Cal.Rptr.2d 107].)

█ Although the level of detail will vary depending upon an alternative's potential for feasibility, in every case, the EIR must disclose "the 'analytic route the . . . agency traveled from evidence to action.' [Citations.]" (*Laurel Heights, supra,* 47 Cal.3d at p. 404.) And the lead agency itself must travel that analytic route: It "must *independently* participate, review, analyze and discuss the alternative in good faith." (*Kings County, supra,* 221 Cal.App.3d at p. 736.) The agency may not simply accept at face value the project proponent's assertions regarding feasibility. (*Sierra Club v. County of Napa, supra,* 121 Cal.App.4th at p. 1504; see also *Laurel Heights, supra,* at p. 404 [courts will not "countenance a result that would require blind trust by the public"].) The applicant's feeling about an alternative cannot substitute for the required facts and independent reasoning. (*Preservation Action Council v. City of San Jose, supra,* 141 Cal.App.4th at p. 1356.)

Here, the analytical route initially taken by the County with respect to the BLM alternative is straightforward: The BLM was not interested in the Whitney Portal land because it "contained no particularly unusual or superior environmental habitat or characteristics which would make it a candidate for a land exchange"; therefore, an exchange was "impractical." If, in fact, the BLM was unwilling to consider exchanging its land for Walters's Whitney Portal parcel, the alternative is necessarily infeasible, and nothing more needs to be said. (See *Goleta Valley, supra,* 52 Cal.3d at p. 574 [when the infeasibility of an alternative is readily apparent, it "need not be extensively considered"]; *Save Our Residential Environment v. City of West Hollywood* (1992) 9 Cal.App.4th 1745, 1754 [12 Cal.Rptr.2d 308] [some conclusions "are so simple they are almost self-explanatory"].)

█ The defect in the DEIR's discussion is clear from the comments and responses included in the final EIR: the County's premise—that the BLM did not want the Whitney Portal property—is effectively contradicted by the BLM in Dunkelberger's comments. According to Dunkelberger, it was Walters, not the BLM, that was unwilling to participate in a land exchange. Dunkelberger's comments are consistent with the notes in the administrative

record of a pre-DEIR scoping meeting, which state that Walters was not a "willing seller" and "does not want to swap his land for other lands."[9] Indeed, Dunkelberger states that the BLM "certainly would have entertained" an exchange if Walters expressed any interest. Moreover, Walters admits in his report submitted for the FEIR that the BLM parcel may have been made available to him if he had found it acceptable. The analysis in the DEIR is thus unsupported by substantial evidence.

But the DEIR is, of course, a *draft* document subject to public comment and further analysis. Relative to this issue, the FEIR supplemented the DEIR with Dunkelberger's written comments, Walters's report in which he states that the BLM parcel was unacceptable to him because it did not have the "amenities enjoyed by" his property, such as the view and proximity to running water, the map showing the BLM parcel's rectangular shape and its relation to certain roads and the County's responses to SRVA's and Dunkelberger's comments. In the FEIR, the County no longer asserted that the BLM was not interested in the Whitney Portal parcel. Instead, three reasons for the inadequacy of the alternative are discernable: (1) the BLM parcel was designated in the general plan as state and federal lands and not for residential development; (2) the "quality" of the proposed BLM parcel was inferior to the Whitney Portal parcel "due to aesthetic/view issues"; and (3) Walters could not expect to achieve the same economic objectives with the BLM parcel that he could with the Whitney Portal parcel.

The County's responses to public comments regarding the land exchange alternative in the FEIR, we conclude, falls short of the meaningful discussion that CEQA requires.

■■■ We first address the County's explanation that the BLM parcel was designated in the general plan as state and federal lands and not for residential development. Although the inconsistency of a land use designation is a relevant consideration in evaluating an alternative, the mere fact that an alternative would require an amendment to the general plan or a change in zoning designation is an insufficient basis for rejecting an alternative. (*Goleta Valley, supra*, 52 Cal.3d at p. 573.) According to SRVA, the current land use designation of the BLM parcel is merely a reflection of the fact that the property is owned by the federal government and therefore beyond the control of the local government. If a land exchange occurs, the ownership of

---

[9] Notes of this scoping meeting state: "BLM enters into land exchanges only when two things occur: [¶ 1.] When there is a 'willing seller.' Mr. Walters does not qualify as a willing seller in that he does not want to swap his land for other lands, because his land is so desirable/valuable. [¶ 2.] When such a swap is 'warranted.' This usually means that a developer/owner's land is 'undevelopable' in some sense and they want to swap for land that can be developed. Again, this is not the case with Mr. Walters, as his property is designated for residential development under the Inyo County General Plan and Zoning Ordinance."

the parcel will necessarily change, and, SRVA contends, "only a minor General Plan amendment" would be necessary to allow residential development of the parcel. Whether the required change in the general plan or zoning designation is as simple as SRVA claims or is not so easily accomplished cannot be determined from the EIR. We agree with SRVA, however, that the EIR provides no reasoning or evidence explaining why such changes in the land use designation should preclude a more in-depth consideration of the BLM parcel. The statement that the alternative site is not currently designated for residential development, without addressing the issues raised by such designation or relating that fact to feasibility, does not enable informed public participation and decisionmaking.

There are numerous problems with the County's second rationale—that the BLM parcel is "inferior . . . due to aesthetic/view issues" and not comparable in quality. First, the references to aesthetics, views, and quality are, without more, simply too vague and conclusory to enable "meaningful participation and criticism by the public." (*Laurel Heights, supra,* 47 Cal.3d at p. 405.) At best, the comments are suggestive of a legitimate factor for evaluating feasibility—site suitability. (See Guidelines, § 15126.6, subd. (f)(1).) However, the EIR includes no meaningful information regarding any physical features, hydrological characteristics, views from the property, access to trails, or other attributes relevant to the suitability of the property for the project. The public and decision makers are told virtually nothing meaningful about the BLM parcel other than its location and its 100-acre size, neither of which necessarily preclude the parcel's suitability for the contemplated residential development. If the BLM parcel is indeed an unsuitable site for the project due to whatever the County referred to as "aesthetic/view issues," much more must be said to adequately inform the public and decision makers.

 Second, the County's statements appear to be based entirely upon the report of Walters, who expressed his opinion that the BLM parcel was not acceptable or feasible because it does not have the view and proximity to running water that adorn the Whitney Portal parcel. As stated above, however, the agency preparing the EIR may not simply accept the project proponent's assertions about an alternative; rather, the agency "must *independently* participate, review, analyze and discuss the alternatives in good faith." (*Kings County, supra,* 221 Cal.App.3d at p. 736.) Merely restating Walters's perceptions concerning the quality of the BLM parcel does not satisfy this standard.[10]

---

[10] That the BLM parcel was "not acceptable" to Walters suggests that he would not agree to a land exchange in any event. However, the willingness or unwillingness of a project proponent to accept an otherwise feasible alternative is not a relevant consideration. (*Uphold Our Heritage v. Town of Woodside* (2007) 147 Cal.App.4th 587, 602 [54 Cal.Rptr.3d 366].) If

Next, even if "aesthetics," "views," and "quality" are meaningful in this context, the EIR does not explain how such matters impact the feasibility of achieving the basic objectives of the project on the BLM site. Indeed, although there is a detailed description of the "project objectives" in the section of the EIR addressing alternatives, there is no reference to the views from the proposed site.[11] Nor is there any reference to a watercourse in the statement of project objectives. The statement does refer to "aesthetic issues such as structure setbacks, building envelope area, structure materials and colors, lighting, and landscaping." If this is what the County was referring to when it stated that the BLM parcel was inferior due to "aesthetic" issues, there is nothing in the EIR to indicate that the necessary setbacks and other aesthetic points cannot be incorporated into the development of the BLM parcel.

The third reason for rejecting the BLM parcel alternative—that Walters could not expect to achieve the same economic objectives—is also unsupported.[12] First, the statement reflects a misunderstanding regarding the economic feasibility of an alternative. Although the "economic viability" of an alternative is a relevant consideration in evaluating the feasibility of the alternative (see Guidelines, § 15126.6, subd. (f)(1)), the fact that Walters cannot achieve the *same* economic objective from developing the BLM property is not determinative. The issue is not whether the alternative is less profitable than the project as proposed, but whether the reduced profitability of the alternative is " 'sufficiently severe as to render it impractical to proceed with the project.' [Citation.]" (*Preservation Action Council v. City of San Jose, supra,* 141 Cal.App.4th at p. 1357; see also *Maintain Our Desert*

---

development of the project on the alternative parcel will satisfy the basic objectives of the project and mitigate the environmental impacts of the project as proposed, the Planning Commission could deny the permit for the project. That is, although the Planning Commission and the Board cannot compel Walters to accept a land exchange, they can withhold their approval of the proposed subdivision if he does not agree to the exchange.

[11] The "Project Objectives" section in the portion of the DEIR discussing alternatives states, in relevant part: "The primary objective of the project is to develop a 74-acre parcel for residential use. The project site is the Alabama Hills area to the west of the town of Lone Pine, near the base of the Sierras, and adjacent to Whitney Portal Road. The project would consist of 27 rural residential lots, 2.5-acre in size. Thirteen of the lots would exist as equestrian lots, with access to adjacent BLM land containing trails and roads. Lots will have individual water wells and septic systems. A Homeowner's Association for the subdivision will be governed by Conditions, Covenants, and Restrictions (CC&R's) which require extensive attention to aesthetic issues such as structure setbacks, building envelope area, structure materials and colors, lighting, and landscaping. The proposed project is in compliance with the Inyo County General Plan designation for the property, which is Residential Rural Medium Density (RRM) development of 1 dwelling unit per 2.5 acre."

[12] The phrase "economic objectives" is also vague. We assume it refers to the goal of maximizing Walters's profit in developing the property (or at least minimizing any financial loss). To the extent some other meaning is intended, our incorrect assumption simply highlights the phrase's ineffectiveness in informing the public.

*Environment v. Town of Apple Valley* (2004) 124 Cal.App.4th 430, 449 [15 Cal.Rptr.3d 322]; *Kings County, supra*, 221 Cal.App.3d at p. 736.) The bare conclusion that Walters would not achieve the same economic objectives under a land exchange with the BLM does not address this issue.

Second, even if the County's statement could be construed as a finding of economic infeasibility under the proper test, there is no evidence or analysis whatsoever of the comparative costs or profitability of developing the two parcels. (See, e.g., *Uphold Our Heritage v. Town of Woodside, supra*, 147 Cal.App.4th at pp. 598–599.) Although the County responded to Dunkelberger's comments by stating that the BLM did not have available land that was "comparable in . . . price," there is nothing in the EIR that informs the public or decision makers of the "price" or comparative value of the BLM parcel. To the extent that the County's statements regarding Walters's economic objectives and price of alternative parcels are based on Walters's own statements, we again remind the parties that it is the lead agency's responsibility to independently review and analyze the alternatives.[13]

In the context of economic feasibility, we address Dunkelberger's comments to the effect that a land exchange with the BLM has been made more difficult by the "impending development" on the Whitney Portal parcel. Dunkelberger further states that it is difficult for the BLM to discuss an exchange "after a development proposal has already been processed by the county." Dunkelberger appears to assume that the tentative tract map will be approved and that development on that parcel is likely to proceed, thus raising the value of the Whitney Portal parcel relative to the BLM parcel. However, any increase in value of the Whitney Portal parcel attributable to the approval of the tentative tract map is, of course, entirely dependent upon such approval; and the tentative tract map cannot be approved until an EIR that adequately addresses alternatives has been completed. If an alternate site is both environmentally superior and feasible, the Planning Commission or the Board could deny approval of the project on the Whitney Portal parcel. Economic feasibility of an alternative, therefore, must be determined without regard to the possibility that the project will be approved as proposed (i.e., on the Whitney Portal parcel). (See *Kings County, supra*, 221 Cal.App.3d at p. 737 [in analyzing alternatives, progress on the project pending environmental review "cannot render an alternative infeasible"].)

---

[13] We do not suggest that an economic analysis is necessarily required in order to address the feasibility of the land exchange alternative. (See *Sierra Club v. County of Napa, supra*, 121 Cal.App.4th at pp. 1505–1506 [CEQA does not require analysis of economic feasibility].) If, for example, the County concludes that the basic objectives of the project cannot be achieved regardless of economic feasibility, an analysis of economic viability may not be necessary. If, however, the County relies upon economic viability as a basis for finding the alternative infeasible, it must support its conclusion by applying the correct standard to the applicable facts.

At oral argument, the County asserted for the first time that the BLM parcel cannot be exchanged because Congress, in 1931, withdrew the BLM parcel from "disposal." Counsel referred us to chapter 517 of the Statutes at Large of the 71st Congress, which provides that the public lands described in that chapter are "withdrawn from settlement, location, filing, entry or disposal under the land laws of the United States . . . ." (Pub.L. No. 71-864 (Mar. 4, 1931) 46 Stat. 1530 (1931 Act).) According to County's counsel, the property referred to in the 1931 Act cannot be disposed of without a further act of Congress. There are four problems with this argument. First, by waiting until oral argument to inform us of the 1931 Act and assert this issue, the County has forfeited the argument. (See *Boehm & Associates v. Workers' Comp. Appeals Bd.* (2003) 108 Cal.App.4th 137, 148 [133 Cal.Rptr.2d 396].) Although we could reach the issue despite such forfeiture (see, e.g., *Tan v. California Fed. Sav. & Loan Assn.* (1983) 140 Cal.App.3d 800, 811 [189 Cal.Rptr. 775]), we decline to do so here because the argument raises issues concerning the interpretation of federal law that SRVA has not had an opportunity to brief. In particular, it is not clear from the applicable federal law that the 1931 Act has survived the more recent enactment of the Federal Land Policy and Management Act of 1976 (FLPMA; 43 U.S.C. § 1701 et seq.), which expressly authorizes exchanges of public land. This law provides that a "tract of public land or interests therein may be disposed of by exchange by the Secretary [of the Interior] under this Act and a tract of land or interests therein within the National Forest System may be disposed of by exchange by the Secretary of Agriculture under applicable law where the Secretary concerned determines that the public interest will be well served by making that exchange. . . ." (43 U.S.C. § 1716(a); see *id.*, § 1702(g).) The phrase, "public lands," is defined as "any land and interest in land owned by the United States within the several States and administered by the Secretary of the Interior through the Bureau of Land Management, without regard to how the United States acquired ownership, except—[¶] (1) lands located on the Outer Continental Shelf; and [¶] (2) lands held for the benefit of Indians, Aleuts, and Eskimos." (*Id.*, § 1702(e).) No exception is made for land owned by the United States and previously withdrawn from disposal. Thus, according to the plain language of the statute, the subject BLM parcel is "public land" that "may be disposed of by exchange" by the Secretary of the Interior. Such language appears to conflict with the 1931 Act and arguably effects an implied repeal of the earlier law. (See *Branch v. Smith* (2003) 538 U.S. 254, 273 [155 L.Ed.2d 407, 123 S.Ct. 1429]; *Burlington Northern & Santa Fe Ry. Co. v. Public Utilities Commission* (2003) 112 Cal.App.4th 881, 891 [5 Cal.Rptr.3d 503].) Without the opportunity for SRVA to brief this and other issues raised by the County's argument, we decline to address it.

Second, the alleged withdrawal of the land from disposal was not mentioned in the EIR. Indeed, Walters's statement that the land "may have been

made available for exchange" if he found it acceptable suggests that the land could be the subject of an exchange. Moreover, if the land was not available for exchange, we would expect that Dunkelberger, a BLM representative, would have informed the County of this fact during the EIR process. Yet, Dunkelberger not only failed to mention this in his comments to the DEIR, but he indicated that an exchange would have been possible if Walters was amenable to it. There is, in short, nothing in the EIR itself that indicates that the BLM parcel had been withdrawn from lands available for exchange. If, in fact, the parcel has been withdrawn, the failure to mention such withdrawal in the EIR effectively deprived the public of the opportunity to respond and comment on that fact and its effect on the feasibility of an exchange.

Third, the record does not reveal that the BLM parcel is necessarily included in the 1931 Act. The only reference in the record to a legal description of the BLM parcel is Walters's statement that it consists of 100 acres out of 640 acres in "section 18, township 16S, 36E." The nearest match to this description in the 1931 Act is the following: "the south half northeast quarter, the northwest quarter northeast quarter, lot 1, lot 2, northwest quarter, lot 2, lot 1, southwest quarter, and the southeast quarter section 18; . . . all in township 16 south, range 36 east, Mount Diablo meridian." (Pub.L. No. 71-864 (Mar. 4, 1931) 46 Stat. 1530, 1537–1538.) The 1931 Act thus encompasses some, *but not all*, of section 18, township 16 south, range 36 east. Walters does not state in what part of such section 18 the 100-acre BLM parcel is located. Thus, whether the BLM parcel is within the area described in the 1931 Act simply cannot be determined from our record.

Finally, even if, as Walters asserted before the Board, an act of Congress is required to effect an exchange for the BLM parcel, this does not necessarily render the alternative infeasible. As the County's counsel pointed out, Congress has previously acted to revoke the withdrawal of 15.69 acres of property described in the 1931 Act to allow the property to be conveyed to a particular individual. (See Private L. No. 101-4 (Oct. 17, 1990) 104 Stat. 5141.)[14] Although the phrase, "it would take an act of Congress," is idiomatic of something difficult to accomplish or unlikely to occur, we have no basis

---

[14] This law provides: "Notwithstanding the Act of March 4, 1931 (46 Stat. 1530), or Executive Order 5843 or any land classification based thereon, the Secretary of the Interior (hereinafter referred to as the 'Secretary') is authorized and directed to convey to Richard Saunders (hereinafter referred to as the 'beneficiary'), . . . approximately 15.69 acres of land in township 6 south, range 32 east, Mount Diablo Meridian, section 21, northeast 1/4, northeast 1/4, in Inyo County, California, as depicted on a map entitled 'BLM Land Conveyance to Richard Saunders/Inyo County, California' and dated April, 1990." (Private L. No. 101-4 (Oct. 17, 1990) § 1, 104 Stat. 5141.) The County's counsel referred us to this law to show how rarely Congress acts to revoke a prior withdrawal. However, he provided no evidence or argument that any person had ever sought and failed to obtain a congressional revocation of the withdrawal of land under the 1931 Act.

for concluding that Congress would not permit the BLM to exchange a 100-acre parcel for Walters's land if the BLM determines that "the public interest [would] be well served by making that exchange."[15] (43 U.S.C. § 1716(a).) Thus, even if Congress is required to act to effect an exchange, such requirement, without more, is insufficient to establish infeasibility.

In holding that the EIR is inadequate with respect to the analysis of alternatives, we emphasize that we express no opinion as to whether the BLM parcel is or is not a feasible alternative to the project as proposed. An adequate analysis of the BLM parcel alternative may well reveal that developing the project on that parcel is not feasible for one or more reasons. Although Dunkelberger has indicated that the BLM might "entertain" discussions about a land exchange, the BLM may ultimately decide not to make its land available for exchange. There may be physical, hydrological, or other features of the BLM parcel, as well as environmental and economic considerations, that would render development on that land infeasible. However, this EIR includes only the barest of facts regarding the BLM parcel, vague and unsupported conclusions about aesthetics, views, and economic objectives, and no independent analysis whatsoever of relevant considerations. In this respect, the County failed to proceed in the manner required by law. (See Pub. Resources Code, § 21168.5.) The failure is prejudicial, and requires reversal, because it effectively " 'preclude[d] informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process.' [Citations.]" (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1391 [133 Cal.Rptr.2d 718].)

D. *EIR's Analysis of the Project's Impacts on Special Status Species*

SRVA contends that the EIR fails to adequately analyze the project's impact on three species—the Brewer's sparrow, the northern sagebrush lizard, and the San Emigdio blue butterfly. We hold that the analysis of this area is sufficient.

1. *Discussion of Biological Resources in the EIR*

As is relevant here, the DEIR states that two "special status species" were found on the project site, "but otherwise no species that were proposed for

---

[15] The County's counsel asserted during oral argument that the Los Angeles Department of Water and Power would likely oppose any bill to permit the exchange. The assertion is conjecture and without support in the record.

listing as rare, threatened, endangered or of special concern were identi-
fied."[16] The two special status species are Brewer's sparrow and northern
sagebrush lizard. The DEIR concludes that "neither of these two species will
be significantly impacted by the proposed project due to the fact that they are
both common throughout Inyo County."

The DEIR's conclusions are supported primarily by a report prepared by
Mark Bagley and Denise LaBerteaux (the Bagley-LaBerteaux report) and a
letter from LaBerteaux, which are included in the DEIR. The Bagley-
LaBerteaux report is based upon a physical survey of the project site,
interviews with local agency personnel and wildlife experts, information from
the California Natural Diversity Database, and local records. The authors
identified 27 special status wildlife species that have some potential of
occurring on the project site and an additional 28 special status species
occurring in the general region of the site. The report includes a brief
description of each of the special status species that have some potential of
occurring on the site and an estimate of how common the species is on the
site. A table setting forth the basis for excluding the additional 28 species
from consideration is provided. An additional report concerning a raptor
species and the western burrowing owl was also prepared and included in the
DEIR.

According to the Bagley-LaBerteaux report, the northern sagebrush lizard
is a "Federal Species of Concern and a BLM sensitive species."[17] These
lizards "are expected to be common year-round residents on the project site."
LaBerteaux concluded that the "lizards are very common in the general area
and throughout Inyo County. They are not expected to be significantly
impacted by the proposed project."

The Bagley-LaBerteaux report states that the Brewer's sparrow is listed on
the "Audubon Watch List and on the U.S. Bird Conservation Watch List."
LaBerteaux observed a single sparrow on the site during her survey, which
she determined was probably migrating through the area. She noted that the
bird is a "common summer resident in Inyo County and may breed on the
Walters property." She concluded that, "because Brewer's Sparrows are
common breeders throughout Inyo County, the proposed project is not
expected to significantly impact this species."

---

[16] A "special status species" includes species that are either "declining at a rate that could
result in listing or historically occurred in low numbers, and known threats to their persistence
currently exist."

[17] According to the Bagley-LaBerteaux report, BLM "sensitive species" are "species that are
1) under status review by the [U.S. Fish and Wildlife Service]; or 2) whose numbers are
declining so rapidly that federal listing may become necessary; or 3) with typically small and
widely dispersed populations; or 4) those inhabiting ecological refugia or other specialized or
unique habitats." The report does not define a "Federal Species of Concern."

The DEIR does not mention the San Emigdio blue butterfly. According to the Bagley-LaBerteaux report, this butterfly is a "Federal Species of Concern." The butterfly lays its eggs on the leaves of the four-winged saltbush, which "occurs very infrequent[l]y in the project site." The low density of these plants on the site "suggests that the density of San Emigdio blues in the project site is likely to be very low."

In its response to the DEIR, SRVA asserted that the County's conclusion regarding the impact on biological resources was unsupported by analysis or evidence. SRVA supported this criticism with a letter from Diane Renshaw, a consulting ecologist, who disagrees with the methods and conclusions of the Bagley-LaBerteaux report. Renshaw's letter is included in the FEIR. The Planning Commission responded to the principle points made in Renshaw's letter, generally referring to the conclusions in the Bagley-LaBerteaux report and LaBerteaux's letter.

Dunkelberger also criticized the DEIR's analysis of biological impacts. In response, the Planning Commission stated: "While the project may have some localized impact to the animal populations on the site and immediately adjacent to it, the vast area of similar habitat surrounding the effected areas provides plentiful support for all species that appear on site and ensure that any effect on these animal populations are less than significant overall." Both Dunkelberger's comments and the Planning Commission's response are included in the FEIR.

2. *Analysis*

The extent of an evaluation and analysis of environmental impacts in an EIR is guided by a "rule of reason": "An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. Disagreement among experts does not make an EIR inadequate, but the EIR should summarize the main points of disagreement among the experts. The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." (Guidelines, § 15151.)

Here, the analysis and conclusions in the EIR concerning impacts on wildlife are supported by the Bagley-LaBerteaux report and LaBerteaux's letter. The drafters of an EIR may, of course, rely upon the credible opinions of experts concerning environmental impacts. (See *Laurel Heights, supra,* 47 Cal.3d at pp. 408–409.) SRVA has the burden on appeal of demonstrating that

these sources are so "clearly inadequate or unsupported" as to be "entitled to no judicial deference." (*Id.* at p. 409, fn. 12.) It has not satisfied this burden. There is no attempt to challenge the expert qualifications of the authors of the Bagley-LaBerteaux report. Although the methods and conclusions of the report are criticized by SRVA and SRVA's expert, a disagreement among experts does not make an EIR inadequate. (*Id.* at p. 409.) The FEIR included the comments critical of the DEIR's analysis, including the opinion of SRVA's expert, and the Planning Commission's responses, thereby alerting public decision makers to the differing opinions.

SRVA argues that the EIR must include a "quantitative analysis"; that is, in order to determine the effect on the population of affected species as a whole, the agency would have to "know the size of the population and . . . quantify the potential effects of the project." However, "the issue is not whether the studies are irrefutable or whether they could have been better. The relevant issue is only whether the studies are sufficiently credible to be considered *as part of* the total evidence that supports the" agency's decision. (*Laurel Heights, supra,* 47 Cal.3d at p. 409; see also *National Parks & Conservation Assn. v. County of Riverside* (1999) 71 Cal.App.4th 1341, 1362 [84 Cal.Rptr.2d 563] ["an expert can make a judgment on existing evidence, without further study, that a particular condition will have no significant impact"].) The sources of information supporting the EIR's analysis, we conclude, satisfies this test. Thus, even if the DEIR's analysis on this point "could have been better," it is adequate, sufficiently complete, and a good faith effort at full disclosure. (See Guidelines, § 15151.)

SRVA relies heavily upon *Sierra Club v. Martin* (11th Cir. 1999) 168 F.3d 1 (*Martin*). *Martin* involved the United States Forest Service's alleged noncompliance with a land and resource management plan for the Chattahoochee National Forest (Forest Plan) and Forest Service regulations. (*Id.* at p. 3.) The Forest Plan required the Forest Service to collect population inventory data for certain categories of species before implementing a decision affecting the forest. (*Ibid.*) Although the circumstances requiring such an inventory were present, the Forest Service did not collect the population data. Therefore, the Eleventh Circuit held that the Forest Service's approval of timber sales without such data was arbitrary and capricious. (*Id.* at p. 5.)

*Martin* is easily distinguished. That case turned on the application of specific requirements of the applicable Forest Plan to conduct a population inventory of relevant categories of species. That Forest Plan is not applicable to Walters's property and we have not been provided with any authority holding that CEQA requires a similar collection of data. *Martin* has no application to this case.

## E. *EIR's Analysis of the Project's Visual Impacts*

SRVA argues that the analysis of the project's visual impacts improperly fails to consider the fact that, in addition to the residences to be built on the subdivided lots, the project calls for the building of a fire station, a 3,800-gallon aboveground water tank on each lot, and a 20,000-gallon tank at the fire station.

CEQA, as mentioned above, does not "mandate perfection, nor does it require an analysis to be exhaustive." (*Dry Creek Citizens Coalition v. County of Tulare* (1999) 70 Cal.App.4th 20, 26 [82 Cal.Rptr.2d 398].) The courts look for adequacy, completeness, and a good faith effort at full disclosure. (Guidelines, § 15151.) Moreover, even if the failure to address the fire station and water tanks is deemed to be noncompliant with CEQA, we will not reverse unless prejudice is shown. (*San Joaquin Raptor Rescue Center, supra*, 149 Cal.App.4th at p. 653.) "A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process." (*Kings County, supra*, 221 Cal.App.3d at p. 712.)

No such prejudice is shown here. The proposed fire station is described in the CC&R's and must not exceed 18 feet in height, which is less than the lowest height restriction on the residences. The water tanks are also disclosed in the CC&R's. Although the County did not specifically analyze the visual impacts of these structures, the public and the decision makers were informed of their existence and could readily understand that they might be visible from outside the project. Moreover, even without explicitly taking these structures into account, the EIR provides that the project will have a significant, irreversible adverse impact on the existing scenic views of the area. It is unlikely that a different conclusion would have been reached if the additional structures were specifically addressed. Reviewing the EIR and the decisionmaking process as it is revealed in the record, we conclude that the failure to include a discussion of the fire station and water tanks in the visual impacts analysis did not preclude informed decisionmaking or informed public participation.

## IV. DISPOSITION

The judgment is reversed with directions to the trial court to issue a peremptory writ, consistent with the views expressed in this opinion, directing the respondents to: (1) vacate their certification of the EIR and their approval of the project; and (2) not take any further action to approve the project without the preparation, circulation, and certification under CEQA of

a legally adequate EIR with respect to the analysis of the feasibility of the alternative of a land exchange with the BLM.[18] SRVA shall recover its costs on appeal.

McKinster, Acting P. J., and Miller, J., concurred.

---

[18] In its petition for writ of mandate, SRVA sought the recovery of attorney fees pursuant to Code of Civil Procedure section 1021.5. We offer no opinion regarding the entitlement to such fees. On remand, the trial court shall determine any issues raised by that request.