[No. B222776. Second Dist., Div. Four. Apr. 5, 2011.]

SANTA MONICA BAYKEEPER, Plaintiff and Appellant, v. CITY OF MALIBU, Defendant and Respondent.

1540

COUNSEL

Law Office of Rose M. Zoia and Rose M. Zoia for Plaintiff and Appellant.

Jenkins & Hogin, Christi Hogin and Gregg Kovacevich for Defendant and Respondent.

OPINION

EPSTEIN, P. J.—Santa Monica Baykeeper (Baykeeper), a nonprofit corporation, appeals from the denial of its petition for writ of mandate. Its suit challenged the City of Malibu's (City) adoption of an environmental impact report (EIR) and approval of the Legacy Park project in Malibu, California. The suit was brought pursuant to the California Environmental Quality Act. (Pub. Resources Code, § 21000 et seq.; CEQA.) Baykeeper argues the EIR failed to adequately analyze (1) construction-related water quality impacts; (2) the impact of using treated effluent from the adjoining Malibu Lumber Yard project on the project site; and (3) the cumulative groundwater impacts of the project.

City argues that the appeal is moot and should be dismissed on that ground. We agree that it is moot as to Baykeeper's challenge regarding construction-related impacts because the project was completed during the pendency of this appeal and no recognized exception to the mootness doctrine applies to warrant discretionary review of that issue. The other issues in the appeal are not moot. But the conclusions in the final EIR regarding the

impact of using treated effluent from the adjoining Lumber Yard project are supported by substantial evidence, and as to these, Baykeeper has failed to demonstrate a prejudicial abuse of discretion warranting reversal. We also find substantial evidence supporting City's conclusion that the Legacy Park project reduces rather than creates groundwater impacts and therefore no cumulative groundwater impacts analysis was required. The judgment is affirmed.

## FACTUAL AND PROCEDURAL SUMMARY

### A. *Project Description*

Malibu Creek is the primary drainage artery of a 110-square-mile watershed. It is subject to water quality impairments caused by stormwater runoff, dry-weather runoff, animal waste, and the potential that onsite wastewater treatment systems (OWTS) may fail. Malibu Creek, Malibu Lagoon, and Surfrider Beach are on the Clean Water Act of 1977's[1] list of impaired water bodies for bacteria and nutrients. After a number of studies and risk assessments conducted starting in 2000, the City decided to address water quality problems associated with urban stormwater runoff and the potentially failing onsite wastewater systems in the civic center area (340 acres in the central part of the City). The Legacy Park project site (site) is described in the final EIR as 15 acres in the Malibu Civic Center (Civic Center), "at the terminus of the Malibu Creek watershed where Malibu Creek drains into Malibu Lagoon, which periodically discharges to Surfrider Beach when the berm separating the Lagoon from the ocean is breached."[2]

The Malibu Lumber Yard commercial project is on the eastern side of the site. It was approved in August 2007 and included construction of an 85,600-square-foot dispersal field within the Legacy Park site to which treated wastewater effluent from the Lumber Yard was to be discharged.[3] There were no challenges to the Lumber Yard project approvals. As part of the Legacy Park project, for 10 months of the year all of the Lumber Yard effluent is expected to be used to irrigate vegetation at Legacy Park. During

---

[1] Title 33 United States Code section 1251 et seq.

[2] The project site was purchased by the City in March 2006, with covenants and restrictions setting out the permitted and prohibited uses for the site.

[3] Subsurface dispersal of treated effluent from the Lumber Yard project to a portion of the Legacy Park site was approved by the City in 2007, through a mitigated negative declaration. A mitigated negative declaration is issued after an initial study identifies potentially significant effects, but revisions in the project would avoid the effects or mitigate the effects to a point they are not significant. (*Wollmer v. City of Berkeley* (2009) 179 Cal.App.4th 933, 937, fn. 4 [102 Cal.Rptr.3d 19].) The Regional Water Quality Control Board issued the necessary permits. City informs us that the Lumber Yard project has been operating since April 2009.

December and January, it is anticipated that excess treated Lumber Yard effluent not needed for Legacy Park irrigation will be discharged directly to Malibu Creek. A key issue in this appeal is whether this use of the Lumber Yard treated effluent will have an impact on groundwater as a result of its use for irrigation of Legacy Park.

As originally conceived, the Legacy Park project had four primary elements: "1) stormwater detention and treatment, 2) habitat restoration, 3) public park, and 4) wastewater treatment and reuse." The draft EIR explained: "Although different drivers exist for each of the four elements for the proposed project, the overall purpose of the proposed project is to provide an integrated plan for the Civic Center area that would protect water quality at nearby beaches and the Lagoon from nitrogen and pathogenic degradation and provide opportunities for restoration of native/sensitive habitats and public recreation."

The stormwater treatment element of the project includes collection of stormwater in an eight-acre-foot detention pond which occupies three to four acres of the Legacy Park site. The pond would be lined with clay to prevent infiltration into the groundwater. The detention pond would operate in conjunction with a preexisting stormwater treatment facility. It will hold 2.6 million gallons of stormwater. If a rainstorm occurs and the pond is full, excess stormwater will flow from the pond to the treatment plant. If it continues to rain after treatment is complete, the water will be discharged to Malibu Creek, but will meet the bacteria TMDL.[4] If the rain stops, the flow will go from the pond to the treatment plant and back to the pond to irrigate the park. The plan is to drain the top four acre feet quickly, treat it, and discharge it into the creek. The bottom four acre feet would either be drained, treated and discharged, or treated and used for irrigation of the park. The detention pond would allow the City to achieve water quality that is, on average, five times greater than that required by the standards for bacterial contamination (bacteria TMDL), and is expected to reduce the number of exceedances to three per year.

The park element includes both the primary Legacy Park site and a 20-foot strip of land just north of Civic Center Way, designated "Linear Park." Legacy Park would allow passive recreation with meandering trails and pathways through various habitats. Educational centers and interpretative areas would be provided. Linear Park would include vegetation and drainage improvements to collect stormwater and convey it to Legacy Park for detention. The habitat restoration element includes coastal prairies, coastal bluffs, Southern California native woodlands, and riparian/wetland habitat. The goals for these habitats are to increase the amount of wetland, increase

---

[4] TMDL is defined in the final EIR as "total maximum daily load."

the amount of regionally rare habitat, provide biodiversity support, contribute to "habitat mosaic/connectivity," provide sustainable natural habitat, replace original habitats, and increase regional biodiversity.

As we shall discuss, the original element of a wastewater system was eliminated when further investigation established the site could not accommodate that plan.

B. *Administrative Process*

Preparation of the project began in January 2007. In conformity with the requirements of section 15063 of the State CEQA Guidelines[5] (Cal. Code Regs., tit. 14), a notice of preparation was prepared and distributed in late 2007. This notice presented a description of the proposed project, potential environmental effects, instructions on how to comment, and notice of a public scoping meeting. The public review period for the notice of preparation ended on December 13, 2007. The public scoping meeting was held at Malibu City Hall on December 5, 2007, where an overview and history of the project was provided with a description of CEQA requirements. A number of potentially significant impacts were identified, and it was determined that an EIR would be appropriate to address these potential impacts.

A draft EIR was prepared and circulated for public review and comment from May through July 2008. Twenty-six written responses were received, including input from Baykeeper. Two public workshops were held by the City in July 2008 to discuss the project, solicit ideas, and answer questions. A final EIR was prepared at the end of the public comment period. It included comments made to the draft EIR and the City's responses. The major change in the final EIR was the elimination of the wastewater element of the project as the result of studies which revealed that the percolation capacity of the project site was insufficient to accommodate that aspect of the plan.

The first version of the final EIR was made public on September 12, 2008. The Malibu Planning Commission (Planning Commission) held a hearing on the application, and continued the item to a date uncertain. Staff was directed to revise the EIR to clarify the project description, supplement the responses to comments, include a discussion of hydrology studies in the area, discuss worst case scenario natural events and their impact, and clarify issues related to the "connectivity" of the Lumber Yard and Legacy Park sites.

A revised final EIR was made public on January 9, 2009. The same month, the Planning Commission gave conditional approval to the project. An appeal

---

[5] California Code of Regulations, title 14, section 15001, states that the Guidelines are to be cited as "State CEQA Guidelines."

of the Planning Commission's action was filed by Baykeeper and other interested groups. These groups argued that CEQA was violated by eliminating the wastewater treatment element of the project six months after the close of the public comment period, and less than two weeks before the Planning Commission vote. They also contended that the revised final EIR failed to address nutrient contamination caused by discharges of treated stormwater or the cumulative hydrology impacts of discharge of Malibu Lumber Yard effluent on the Legacy Park project site. In addition, the final EIR was criticized for failing to adequately respond to all draft EIR comments.

The city council heard and denied the appeal on March 9, 2009. It adopted resolution No. 09-19, certified the EIR, adopted a mitigation monitoring and reporting program, made revised findings of fact, imposed various conditions, and otherwise took the steps necessary to approve the project.

Baykeeper filed a timely petition for writ of mandate challenging the certification of the EIR and project approval on the ground that CEQA requirements were violated. The City answered the petition. The trial court issued a detailed minute order analyzing Baykeeper's challenges and denying the petition. Judgment denying Baykeeper's petition for writ of mandate and in favor of City was entered. This timely appeal followed. We denied Baykeeper's petition for writ of supersedeas and an immediate temporary stay.

## DISCUSSION

### I

The standard of review of a trial court order denying a challenge to an EIR is well established. "In reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.' (Pub. Resources Code, § 21168.5.) Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' [Citations.]" (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426–427 [53 Cal.Rptr.3d 821, 150 P.3d 709], fns. omitted (*Vineyard*).)

In *Vineyard* the Supreme Court explained the difference between the two types of error which may constitute an abuse of discretion under CEQA. "[A]n agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual conclusions unsupported by substantial evidence. (§ 21168.5.) Judicial review of these two types of error differs significantly: While we determine de novo whether

the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161]), we accord greater deference to the agency's substantive factual conclusions. In reviewing for substantial evidence, the reviewing court 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable,' for, on factual questions, our task 'is not to weigh conflicting evidence and determine who has the better argument.' [Citation.]" (*Vineyard, supra*, 40 Cal.4th at p. 435.) A public agency's decision to certify the EIR is presumed correct, and the challenger has the burden of proving the EIR is legally inadequate. (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 530 [78 Cal.Rptr.3d 1]; *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 117 [104 Cal.Rptr.2d 326].)

Here, Baykeeper asserts that de novo review is appropriate since City did not proceed as required by law because the EIR failed to adequately analyze impacts. City disagrees, arguing "[w]hen a challenger alleges that an EIR fails to include sufficient information on a particular issue, the reviewing court should treat such an argument as a claim that the EIR is not supported by substantial evidence, rather than as a claim that the agency failed to proceed in the manner required by law." It cites *Barthelemy v. Chino Basin Mun. Water Dist.* (1995) 38 Cal.App.4th 1609, 1620 [45 Cal.Rptr.2d 688] in support of this argument.

Baykeeper's argument regarding the standard of review is too simplistic. The court in *California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 986 [99 Cal.Rptr.3d 572] explained: "An EIR will be found legally inadequate—and subject to independent review for procedural error— where it omits information that is both required by CEQA and necessary to informed discussion." But CEQA challenges concerning the amount or type of information contained in the EIR, the scope of the analysis, or the choice of methodology are factual determinations reviewed for substantial evidence. (*California Native Plant Society, supra*, at pp. 986–987, citing *Barthelemy v. Chino Basin Mun. Water Dist., supra*, 38 Cal.App.4th at p. 1620.) Put another way, "[w]e apply the substantial evidence test to conclusions, findings, and determinations, and to challenges to the scope of an EIR's analysis of a topic, the methodology used for studying an impact, and the reliability or accuracy of the data upon which the EIR relied because these types of challenges involve factual questions." (*City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 898 [98 Cal.Rptr.3d 137].)

"An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the

same as the trial court's: [t]he appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo. [Citations.] We therefore resolve the substantive CEQA issues . . . by independently determining whether the administrative record demonstrates any legal error by the [agency] and whether it contains substantial evidence to support the [agency's] factual determinations." (*Vineyard, supra,* 40 Cal.4th at p. 427.)

█ In reviewing an EIR, we focus on adequacy, completeness, and a good faith effort at full disclosure. (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1390 [133 Cal.Rptr.2d 718] (*Irritated Residents*).) " 'An EIR must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' [Citation.]" (*Ibid.*)

With these principles in mind, we turn to the specific challenges raised by Baykeeper in this appeal.

## II

Baykeeper argues the EIR's analysis of construction-period impacts on hydrology and water quality from erosion, sedimentation, and the potential release of hazardous materials is deficient because "it fails to determine the *level of* significance of the impact, i.e., how significant is it?" Without this information, Baykeeper contends that effective mitigation measures cannot be established.

In its reply brief, City argues that this issue is moot because the aspect of construction on which Baykeeper's argument is based was completed months ago. It points out that Baykeeper did not seek a stay or other injunction in the trial court to delay construction until this issue could be reviewed.

In light of City's mootness argument, we invited counsel to submit supplemental briefing as to whether any part of this appeal is moot because we can provide no effective relief due to the progress of construction on the project. In its letter, City informs us that construction on the entire project is complete and Legacy Park officially opened on October 2, 2010.

### A. *Mootness Principles*

█ General principles for determining whether an appeal is moot have been applied to CEQA cases. "An appeal should be dismissed as moot when the occurrence of events renders it impossible for the appellate court to grant appellant any effective relief." (*Cucamongans United for Reasonable*

*Expansion v. City of Rancho Cucamonga* (2000) 82 Cal.App.4th 473, 479 [98 Cal.Rptr.2d 202] (*Cucamongans*).) There are three discretionary exceptions to the rules regarding mootness allowing a court to review the merits of an issue: "(1) when the case presents an issue of broad public interest that is likely to recur [citation]; (2) when there may be a recurrence of the controversy between the parties [citation]; and (3) when a material question remains for the court's determination." (*Id.* at pp. 479–480.)

Several courts have considered a CEQA challenge on the merits after determining that effective relief may be granted despite partial or complete construction of the challenged project. In *Woodward Park Homeowners Assn. v. Garreks, Inc.* (2000) 77 Cal.App.4th 880 [92 Cal.Rptr.2d 268] (*Woodward Park*), a project to build two car washes was approved despite a claim by a homeowners association that because of noise issues an EIR was required before the City of Fresno could approve the project. The trial court agreed and ordered the preparation of an EIR. Despite the pending lawsuit and the trial court's order, the developer continued construction and completed the project without obtaining an EIR. On appeal, the City of Fresno argued that an EIR was no longer required because the project was completed. The Court of Appeal held the matter was not moot because "[t]his case does not present a situation where a ruling by this court can have no practical impact or not provide the parties relief." (*Id.* at p. 888.) The court concluded the project could be modified, torn down, or eliminated to restore the property to its original condition. (*Ibid.*)

Similarly, in *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1202–1204 [22 Cal.Rptr.3d 203], the Court of Appeal held that partial construction of a commercial development project did not moot the appeal because the project could still be modified, reduced, or mitigated. It also applied the exception supporting review where the issues presented are of broad public interest likely to reoccur. (See also *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116 [84 Cal.Rptr.3d 614, 194 P.3d 344] [appeal from approval of project to develop site with historic house for senior citizen housing conditioned on future compliance with CEQA not rendered moot by approval of final EIR during pendency of the appeal because no irreversible physical or legal change occurred during pendency of action, and the plaintiff could still obtain relief of city setting aside approvals, ultimately remanded for reconsideration of approvals in light of EIR]; *California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 280 [115 Cal.Rptr.3d 631] [EIR for project necessitating removal of live oak trees not rendered moot by removal of the trees after efforts to stay project were unsuccessful because restoration of the site to its original condition could be compelled, additional mitigation measures could be ordered, or the project could be modified, reconfigured or reduced]; *Association for a Cleaner Environment v. Yosemite Community College Dist.*

(2004) 116 Cal.App.4th 629, 641 [10 Cal.Rptr.3d 560] [removal of gun range without EIR not moot although project completed because of possibility that initial study under CEQA could result in mitigated negative declaration or EIR with mitigation measures].)

A CEQA challenge was found moot in *Hixon v. County of Los Angeles* (1974) 38 Cal.App.3d 370, 378 [113 Cal.Rptr. 433] (*Hixon*). In that case, residents sought a writ of mandate to compel the county to obtain an EIR for a street improvement project involving removal of a substantial number of trees. In the first phase, 1,874 trees were removed and replaced by 3,847 smaller trees, although the new trees would take 25 to 30 years to reach the size of the removed trees. No EIR was obtained for the first phase. The Court of Appeal held that preparation of an EIR for the first phase alone would be futile because the project had ended and the trees had been cut down. (*Id.* at p. 378.)

B. *Parties' Positions*

Baykeeper's letter contends that despite the characterization of these impacts as construction related, effective relief can still be granted. It cites the EIR, which says that construction would require grading and excavation, disturbance of soils and vegetation, and the possibility that stormwater could cause soil erosion of disturbed sites and transport construction-related contaminants[6] to nearby water, impairing water quality and aquatic habitats. Baykeeper claims "now that construction has occurred, further analysis can be based on reality and any impacts from the construction to the water bodies can be mitigated." It cites *Woodward Park, supra*, 77 Cal.App.4th 880 for the proposition that a developer proceeds with a project at its own peril in light of pending litigation. Baykeeper distinguishes *Hixon, supra*, 38 Cal.App.3d 370, arguing here "the project can be modified and the construction impacts can be ameliorated." It does not suggest how this could be accomplished now that the project is finished and operating.

City argues that *Hixon, supra*, 38 Cal.App.3d 370 is more analogous to this aspect of Baykeeper's challenge. It points out that the construction phase activities are complete and will not be repeated. It also relies on *Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559 [120 Cal.Rptr.3d 665] (*Wilson*), a reverse validation action including a CEQA challenge to a retail-cinema project.[7] Although the challenge went to trial in

---

[6] Identified contaminants included fuels, oil, concrete, and paint.

[7] "A 'reverse validation action' is a suit brought under Code of Civil Procedure section 863 in which an interested person seeks a determination of the validity of some public agency action, such as an ordinance or resolution. [Citations.]" (*Wilson, supra*, 191 Cal.App.4th at p. 1567, fn. 3.)

2004, for reasons not explained on the record final arguments were not held until 2007, by which time the project was substantially completed. Nevertheless, the trial court rejected the city's argument that the action was moot and entered judgment against it. The plaintiff had not sought a stay or an injunction to halt the construction. The Court of Appeal held that a project's completion moots requests to set aside or rescind resolutions authorizing a challenged project. It concluded: "The completion of the Project prior to the trial court's entry of judgment therefore meant that nothing could be accomplished by invalidation of the Resolutions, and it follows that Wilson's action was rendered moot." (*Wilson, supra,* 191 Cal.App.4th at p. 1576.)

The plaintiff in *Wilson* cited *Woodward Park, supra,* 77 Cal.App.4th 880 in arguing that the developer proceeded at its own risk by starting construction before final judgment in the trial court. (*Wilson, supra,* 191 Cal.App.4th at p. 1579.) The *Wilson* court distinguished that case, reasoning that the court in *Woodward Park* clearly "was concerned about the public policy effects of finding the appeal moot on the facts before it." (*Id.* at p. 1580.) It quoted the observation of the court in *Woodward Park* that " '[i]t would hardly be sound public policy to allow a party to avoid CEQA by continuing with construction of a project in the face of litigation, delaying preparation of a court-ordered EIR pending appeal, and then arguing the case is moot because the project has been completed and is operating.' " (*Ibid.,* quoting *Woodward Park, supra,* 77 Cal.App.4th at p. 889.) In *Wilson,* neither the city nor the developer proceeded in violation of a court order.

The plaintiff in *Wilson* was held partially responsible for its claims becoming moot because it failed to seek a stay of construction or other preliminary relief. City cites Baykeeper's failure to seek preliminary injunctive relief or a stay of construction to halt progress on the park until it unsuccessfully petitioned for supersedeas in our court just three months before the project was completed. In its petition for writ of supersedeas, cited by City, Baykeeper expressly acknowledged the possibility its appeal would be rendered moot if construction was not stayed: "If the project or any aspect of it is fully constructed and/or in full operation at that time [(we reversed and remanded)], further lower court proceedings would be prejudiced and *potentially partially, if not completely, mooted.*" (Italics added.) Baykeeper also acknowledged that if the project reached full operation, further review could be rendered "useless."

We agree with City that Baykeeper's claims regarding construction phase impacts are now moot. Not only has the construction phase ended, but the entire project is complete and open to the public. Baykeeper does not suggest specifically how we may provide effective relief regarding construction impacts under these circumstances. This is not a situation, like *Woodward*

*Park, supra,* 77 Cal.App.4th 880, in which the public entity and developer attempted to bypass the CEQA environmental review process. The EIR includes extensive mitigation measures to address construction phase impacts. Instead, our case is analogous to *Wilson, supra,* 191 Cal.App.4th 1559, to the extent that Baykeeper failed to take steps to maintain the status quo pending resolution of its claims by seeking injunctive relief or a stay until the appeal reached this court when the project was nearly complete.

Baykeeper asks that we exercise our discretion to reach the merits even if we find the appeal moot. It invokes two of the established exceptions to mootness discussed above: there may be a recurrence of controversy between the parties, and a material question remains for the court's determination. (*Cucamongans, supra,* 82 Cal.App.4th at pp. 479–480.)

In an attempt to come within the exception for recurring controversies, Baykeeper argues: "Here, there is a chance that the project will be modified to accommodate further stormwater and/or effluent treatment capacity. The city left open the possibility of expanding the project or adding features to the project." It postulates: "If further changes occur which require a change to features of the stormwater treatment aspect of the project or the addition of effluent treatment to the project, further construction will be required and the same construction-related and other groundwater impact issues will arise."

This contention is based on speculation about future changes to the project site, which are unknown at this time. While construction-related issues or groundwater issues may arise if the City engages in another project in this area in the future, we cannot conclude on this record that the issues will be the same since any such project is wholly undefined. Moreover, in the event such a future project is proposed, compliance with CEQA, including the possible preparation of an EIR, would be required. (See *Save Round Valley Alliance v. County of Inyo* (2007) 157 Cal.App.4th 1437, 1449 [70 Cal.Rptr.3d 59] ["when future development is unspecified and uncertain, the EIR is not required to include speculation about future environmental consequences of such development."].)

Baykeeper also argues that "the same reasons that the construction impacts are not moot because they are ongoing, . . . support the court's discretion to hear the case because a material question remains for the court's determination, i.e., whether the construction impacts can be mitigated." We have rejected the premise upon which this argument is based, finding the construction impact claims are moot. Baykeeper has not explained how there are recurring issues now that construction has been complete for months.

### III

Before considering the merits of Baykeeper's other challenges to the EIR, we discuss whether those issues are moot as well.

In its supplemental letter brief on mootness, City argues that here, unlike *Woodward Park, supra,* 77 Cal.App.4th 880, in which there was uncontroverted evidence of continuing significant noise impacts, Baykeeper has failed to argue or allege any specific, significant adverse environmental effects. Instead, City says Baykeeper merely complains that the EIR failed to adequately analyze various impacts. It contends that during the administrative process, Baykeeper "did not produce any evidence of potential adverse impacts not discussed and disclosed in the EIR."

Baykeeper argues that impacts of using Lumber Yard treated effluent were not adequately analyzed in the final EIR and are not moot because the use of the Lumber Yard wastewater will continue throughout the life of the project. It contends an order requiring City to reevaluate this aspect of the project "would be effective in that the new EIR would analyze and mitigate the impacts and not simply relegate the obtainment of specific information to the future by proposing a mitigation measure involving the future preparation of a hydrologic assessment to quantify and confirm the dispersal capacity of the site, in violation of CEQA." Similarly, as to its third argument that the cumulative impacts analysis of the final EIR was not adequate, Baykeeper argues "a new EIR would analyze and mitigate the ongoing cumulative impacts."

Here, we conclude Baykeeper makes the better argument. The use of the Lumber Yard wastewater on the Legacy Park site, both for irrigation and for subsurface discharge is planned for the life of the project. Since this is an issue of broad public interest likely to recur, we exercise our discretion to address both remaining issues on their merits. (*Cucamongans, supra,* 82 Cal.App.4th at pp. 479–480.)

### IV

Baykeeper's second challenge to the EIR concerns the percolation of treated wastewater effluent from the adjacent Lumber Yard project onto a portion of the Legacy Park site.

A. *Lumber Yard Wastewater*

As we have discussed, the separate Lumber Yard project produces treated wastewater.[8] The Legacy Park project proposes to use this treated wastewater from the Lumber Yard, in combination with treated stormwater, to irrigate Legacy Park. For 10 months of the year, all the Lumber Yard effluent will be used to irrigate the park. In most years, during the months of December and January, 1,600 to 3,800 gallons of excess effluent from the Lumber Yard per day will be percolated to groundwater on a portion of the Legacy Park site rather than being needed for irrigation. Based on studies conducted for the Lumber Yard project, the final EIR for Legacy Park concludes that this dispersal will be well within the percolation capacity (17,600 gallons per day) of the Legacy Park site.

B. *Legacy Park Draft EIR*

The draft EIR proposed that "treated stormwater would be reused to the maximum extent possible for irrigation *and/or dispersal via underground perforated piping network within the lower southeastern corner of Legacy Park*." (Italics added.) The proposed project was to "intercept, treat, and recycle or disperse collected stormwater to irrigate landscaping and *convey it to the subsurface dispersal facility*." (Italics added.)

In light of this plan for subsurface dispersal of treated stormwater to the Legacy Park site, the draft EIR identified mounding hazards associated with that aspect of the project: "Groundwater mounding can occur under any large or concentrated recycled water dispersal field. When this occurs to a significant extent, the winter water table may rise high enough to interfere with the soil treatment function of nearby OWTS [(onsite water treatment systems)] or the ability of subsurface dispersal fields to drain properly. Previous studies have determined that recharge to the groundwater table beneath the proposed stormwater dispersal area will create a groundwater mound. . . . Because the depth to groundwater within the project area is shallow, groundwater mounding can potentially restrict the capacity of the dispersal system." The draft EIR noted that further study of this issue was required, and "as of March 2008, the City was planning to initiate a Groundwater Mounding Study in the very near future."

The draft EIR identified this impact as significant, but concluded that impacts would be reduced to a less than significant level by implementation of mitigation measure "HYD-5," which called for a hydrologic assessment to

---

[8] This water will be treated to the standard required by California Code of Regulations, title 22, division 4.

confirm dispersal capacity on the Legacy Park site. It also called for implementation of measures to protect groundwater flow based on this assessment, both preconstruction and postconstruction.

## C. *Legacy Park Final EIR*

The element regarding use of treated stormwater was revised in the final EIR to eliminate subsurface dispersal of treated stormwater on the Legacy Park site. References in the draft EIR to dispersal of stormwater via an underground perforated piping network were deleted.

The final EIR deletes the portions of the draft EIR discussed above relating to groundwater mounding and the related mitigation measure HYD-5. A new paragraph of the final EIR states that recycled water used for irrigation "would be limited to levels that do not allow seepage to the groundwater table."[9] It provides that the detention pond's clay lining will not allow "any significant interaction with groundwater." Any stormwater releases will be treated to TMDL requirements. "Therefore, potential impacts on bacterial contamination of groundwater or Malibu Lagoon from these elements would be less than significant."

There were public comments on the final EIR regarding the impact of the project on groundwater. In response, City took the position that elimination of the wastewater treatment element and the subsurface dispersal of treated stormwater meant that there would be no percolation of stored stormwater, nor percolation of stormwater used for irrigation. City also noted that a "Groundwater Mounding Study" had been authorized for all development projects in the Civic Center in accordance with a request from the Regional Water Quality Control Board. That study is to use a groundwater modeling process to evaluate any potential impacts from the introduction of effluent.

Baykeeper acknowledged the EIR had been revised to eliminate subsurface dispersal of stormwater in a letter submitted March 9, 2009, during the appeal of the Planning Commission approval of the project.[10] But it argued that the cumulative impacts of the Legacy Park and Lumber Yard projects had not been adequately analyzed in the final EIR. In response, City asserted that the park, habitat, and stormwater elements of the Legacy Park project will not interfere with groundwater recharge because they are not intercepting water

---

[9] At the city council hearing at which the project was approved, project manager Steve Clary explained that the sophisticated irrigation system for the park would monitor the irrigation requirement so that it is equal to the evapotranspiration capacity of the site on any given day, runoff, groundwater recharge, or percolation to groundwater.

[10] The letter stated: "The EIR's stormwater element has been revised such that it no longer involves subsurface dispersal of treated stormwater."

that is currently entering the groundwater system. Rather, these elements "are storing, treating, discharging, and/or reusing water that is currently discharged to Malibu Creek." City also noted that it had commissioned an areawide groundwater study to assess impacts of percolation of treated wastewater (as opposed to stormwater) so there would be no adverse impact on groundwater. No issue regarding the elimination of the wastewater treatment element of the Legacy Park project is raised in this appeal.

## D. Baykeeper's Argument on Appeal

### 1. Groundwater Impacts

Baykeeper argues that "despite the fact that effluent from the Lumber Yard Project will be discharged on the site and cause mounding, neither the Draft nor Final EIR analyzed the impacts of doing so." It cites the discussion of groundwater mounding in the draft EIR, and criticizes the proposal in the draft EIR to defer analysis to the Groundwater Mounding Study to be conducted in the near future. Baykeeper invokes the rule that reliance on a study to be conducted after approval of the EIR is a violation of CEQA, citing *Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70 [108 Cal.Rptr.3d 478], *Watsonville Pilots Assn. v. City of Watsonville* (2010) 183 Cal.App.4th 1059 [108 Cal.Rptr.3d 577], and *Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296, 307 [248 Cal.Rptr. 352]. Baykeeper argues that the failure of the final EIR to analyze groundwater impacts violates CEQA's informational role.

Baykeeper claims improper reliance on a future study was brought to City's attention during the public comment period on the final EIR and that City failed to adequately respond. It cites an e-mail from what appears to be a staff member of the Regional Water Quality Control Board dated January 21, 2009. This is the date the Planning Commission approved the project. The e-mail advises that "a future hydrology study is not a sufficient mitigation for cumulative and critical groundwater effects. Without quantifying the Civic Center's hydrologic capacity before approving this project, the City may be acting to prevent future treatment of wastewater by precluding the installation of a centralized wastewater treatment facility, or other long-term mitigation project, by allocating land and subsurface disposal capacity to Malibu Lumber and stormwater, alone."

Baykeeper also cites a letter from the State Water Resources Control Board dated March 5, 2009, just before the appeal of the Planning Commission's approval was denied. That letter states that City's responses to comments to the draft EIR were insufficient. It points out that the responses were to defer studies "(e.g., future groundwater mounding and future hydrology studies)

and identification of specific mitigation to a later date." It warns: "Such deferral would not be consistent with the intent of CEQA to disclose to the public and to decision makers the potential impacts and feasible mitigation measures associated with the Project." The State Water Resources Control Board letter also criticized the final EIR for failing to make changes in response to a concern raised by the regional water board regarding cumulative impacts resulting from the project. It points out that "City's overall response was to point out mitigation that again defers studies to a later date."

Steve Clary, project manager, addressed this issue at the March 9, 2009 city council hearing at which the project was approved. He said that the board's concern was based on a scenario which would not happen with this project because the Legacy Park stormwater project would not create groundwater percolation.

### 2. Contamination from Wastewater Discharge

This argument is also based on the use of the Lumber Yard treated water for irrigation or discharge at the Legacy Park site. Baykeeper argues neither the draft nor final EIR's analyzed the level of significance of potential water quality impacts from this discharge.

### E. City Argument

### 1. Groundwater Impacts

City contends the only impact on groundwater at the Legacy Park site will be from the previously approved Lumber Yard, and not from the Legacy Park project as revised in the final EIR to eliminate subsurface dispersal and to strictly control irrigation to avoid percolation of water.

City asserts that Baykeeper's argument is "premised on the false notion that the Legacy Park project includes the subsurface dispersal of treated wastewater generated by the Malibu Lumber [Yard] project. It does not and Appellant knows as much." It argues that the subsurface dispersal of treated wastewater generated by the Lumber Yard project on the Legacy Park site was approved in 2007 and that those approvals were never challenged. It contends that to the extent Baykeeper's argument is actually a challenge to this aspect of the Lumber Yard project, it is time-barred under Public Resources Code section 21167. In *Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 52 [105 Cal.Rptr.3d 181, 224 P.3d 920], the Supreme Court held that a 30-day limitation period applies to appeals from a mitigated negative declaration. A mitigated negative declaration was approved for the Lumber Yard project.

Alternatively, City argues that the Legacy Park project will "virtually eliminate" the existing subsurface discharge of treated wastewater from the Lumber Yard project because it will be used to irrigate the park 10 months out of the year. In light of this reduction, it contends that Baykeeper's argument that the EIR failed to adequately analyze this discharge is without foundation.

## 2. Contamination from Wastewater Discharge

In response to Baykeeper's argument that the final EIR does not adequately analyze potential contamination from Lumber Yard wastewater discharge, City cites the portions of the final EIR analyzing studies conducted for the Lumber Yard project which establish that the dispersal of Lumber Yard effluent will be limited to two months in most years and will be well within the capacity of the dispersal field designated on the Legacy Park site for that purpose.

City contends that it was able to "conclusively determine" that use of treated wastewater and stormwater for irrigation will not have adverse environmental impacts for several reasons: (1) strictly controlled flow rates will not exceed the amount of water absorbed by vegetation and evaporated from the ground, eliminating runoff; (2) grading will contain runoff (e.g., from rain) on the site itself; (3) wastewater from the Lumber Yard project will be treated and disinfected to title 22 standards;[11] and (4) the use of treated effluent from the Lumber Yard was an idea conceived by the Regional Water Quality Control Board and made a condition of approval of the Lumber Yard wastewater treatment system.

## F. Analysis

■ "The fundamental purpose of an EIR is 'to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment.' (§ 21061.) To that end, the EIR 'shall include a detailed statement setting forth . . . [¶] . . . [a]ll significant effects on the environment of the proposed project.' (§ 21100, subd. (b)(1).)" (*Vineyard, supra*, 40 Cal.4th at p. 428.) The *Vineyard* court held that "CEQA's demand for meaningful information 'is not satisfied by simply stating information will be provided in the future.' [Citation.]" (*Id.* at p. 431.)

"Under CEQA's standards for the adequacy of EIR's, an EIR must 'be prepared with a sufficient degree of analysis to provide decisionmakers with

---

[11] California Code of Regulations, title 22, division 4.

information which enables them to make a decision which intelligently takes account of environmental consequences.' ([State CEQA] Guidelines, [Cal. Code Regs., tit. 14,] § 15151.)" (*Planning & Conservation League v. Castaic Lake Water Agency* (2009) 180 Cal.App.4th 210, 242 [103 Cal.Rptr.3d 124].) " 'If a final environmental impact report (EIR) does not "adequately apprise all interested parties of the true scope of the project for intelligent weighing of the environmental consequences of the project," informed decisionmaking cannot occur under CEQA and the final EIR is inadequate as a matter of law. [Citation.]' [Citations.]" (*Communities for a Better Environment v. City of Richmond, supra*, 184 Cal.App.4th at pp. 82–83.)

The *Vineyard* court explained that when an EIR incorporates an EIR performed for an earlier project, "it must give the reader a better road map to the information it intends to convey. (See CEQA Guidelines, Cal. Code Regs., tit. 14, . . . § 15150, subd. (c) [when an EIR incorporates an earlier environmental document by reference, 'the incorporated part of the referenced document shall be briefly summarized where possible' and '[t]he relationship between the incorporated part of the referenced document and the EIR shall be described'] . . . .)" (*Vineyard, supra*, 40 Cal.4th at p. 443.)

 "When an EIR omits information, '[t]he relevant inquiry is whether there has been "a prejudicial abuse of discretion." [Citation.] The absence of information in an EIR "does not per se constitute a prejudicial abuse of discretion. [Citation.] A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process. [Citation.]" [Citation.] . . .' (*Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 748 [22 Cal.Rptr.2d 618].)" (*Planning & Conservation League v. Castaic Lake Water Agency, supra*, 180 Cal.App.4th at p. 242.)

We conclude that the EIR adequately addressed the use of the Lumber Yard treated wastewater on the Legacy Park site. First, as City points out, the creation of a dispersal field for Lumber Yard wastewater on the Legacy Park site was the subject of prior environmental review and approval which was not challenged. To the degree Baykeeper's challenge is focused on the use of the wastewater on the Legacy Park site, it is time-barred.

Second, the final EIR discusses the scientific studies conducted for the Lumber Yard project and based on those studies, concludes that the portion of treated wastewater not used for irrigation in December and January which will be discharged to the dispersal field is well within the percolation capacity of that area of the site. Baykeeper does not cite scientific evidence in the administrative record to contradict those studies.

Third, the administrative record supports the conclusion of the EIR as revised that no treated stormwater collected pursuant to this project will be discharged to the Legacy Park site. It will be collected and detained in the detention pond, treated, and either used for controlled irrigation not to exceed the evapotranspiration capacity, or discharged directly into Malibu Creek rather than on the park site.

■ In summary, the EIR establishes that any groundwater mounding that occurs on the Legacy Park site will result from treated wastewater from the separate Lumber Yard project, not from the Legacy Park project. The EIR on the Legacy Park project took into consideration whether the dispersal area had adequate percolation capacity for that discharge and concluded that it does. The conclusion of the EIR that using Lumber Yard effluent for irrigation of Legacy Park will result in a net reduction of groundwater discharge is supported by substantial evidence.

Baykeeper's second argument, that the EIR failed to adequately analyze the contamination impacts of wastewater discharge, is also focused not on water discharged on the park site from the Legacy Park stormwater element, but instead comes from the use of Lumber Yard treated wastewater. As we have discussed, that usage was the subject of separate, prior approval which was not challenged in court. It is not subject to challenge on review of this EIR.

V

Baykeeper argues the EIR failed to adequately analyze cumulative groundwater impacts.

■ The State CEQA Guidelines, California Code of Regulations, title 14, section 15064 sets out the criteria for determining the significance of environmental effects caused by a project. Subdivision (h)(1) directs the preparation of an EIR "if the cumulative impact may be significant and the project's incremental effect, though individually limited, is cumulatively considerable. 'Cumulatively considerable' means that the incremental effects of an individual project are significant when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects."

" '[A] cumulative impact of a project is an impact to which that project contributes and to which other projects contribute as well. [¶] The project must make some contribution to the impact; otherwise, it cannot be characterized as a cumulative impact of that project.' " (*Sierra Club v. West Side Irrigation Dist.* (2005) 128 Cal.App.4th 690, 700 [27 Cal.Rptr.3d 223] (*West*

*Side*), quoting 1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2003) § 13.36, p. 533.)

Baykeeper points out that the chapter on cumulative impacts in the final EIR includes the Lumber Yard in a list of projects in the general vicinity of Legacy Park pursuant to State CEQA Guidelines, California Code of Regulations, title 14, section 15130, subdivision (b). Under CEQA, it concludes, City was obligated to analyze the cumulative groundwater impacts of the Lumber Yard project in combination with the Legacy Park project, but failed to do so.

In support of this argument, Baykeeper cites a portion of a discussion of mounding hazards from groundwater recharge in the final EIR, but omits critical language. As characterized by Baykeeper, the EIR "acknowledged that the stormwater, park, and habitat elements of the project may impact groundwater, but determined that the mounding impacts would be less than significant." The cited passage is in section 3H of the final EIR, analyzing hydrology and water quality impacts. Under a heading that reads "Mounding hazards associated with groundwater recharge (less than significant [striking out 'after mitigation'])," a subheading reads "Park, Habitat, and Stormwater Elements." The full passage cited by Baykeeper, which was added to the final EIR reads: "No groundwater recharge is proposed as part of these elements. In order to limit interaction with the groundwater table, the stormwater detention pond will be clay lined. Potential mounding impacts from these elements would be less than significant."

Baykeeper argues City was required to determine whether the incremental impact on groundwater, viewed in connection with the effects of the Lumber Yard and other projects, was considerable, citing Public Resources Code section 21083, subdivision (b)(2). It contends that dispersal of treated wastewater from the Lumber Yard project may affect groundwater mounding on the site and that the EIR violates CEQA by not considering the cumulative impact of that effect.

City plans a Groundwater Mounding Study to address the cumulative impact of all development projects in the Civic Center area, "to evaluate any potential impacts, including effects on the downstream OWTS, from the introduction of effluent from each proposed development project. This includes the proposed project, individually and collectively." Baykeeper argues that reliance on a future study to address cumulative impacts, which necessarily defers identification of any necessary mitigation measures, is improper under CEQA which prohibits deferral of analysis to a future date.

City responds that the Legacy Park project does not discharge "anything" to groundwater, and therefore makes no contribution to cumulative groundwater impact. It cites the final EIR, which eliminated the original proposal for subsurface dispersal of treated stormwater and provides that no treated stormwater will be discharged on the site other than strictly controlled amounts for irrigation that will not percolate to the groundwater. It repeats its argument that Baykeeper is actually attempting to challenge the previously approved and unchallenged Lumber Yard project under the guise of this appeal of the Legacy Park project. City argues that the impact of the Legacy Park project, by using all treated effluent from Lumber Yard 10 months of the year for irrigation which will be strictly controlled not to exceed the evapotranspiration capacity of the park, will have a net effect of significantly reducing the amount of subsurface dispersal on the site. It contends since the Legacy Park project makes no contribution to groundwater, "it cannot logically be said to have any effect on cumulative groundwater impacts."

Baykeeper's argument that cumulative analysis was improperly deferred to the future Groundwater Mounding Study is answered by the City: "[B]ecause the Legacy Park project itself contemplates no subsurface discharge to groundwater whatsoever, the results of the mounding study are not necessary to conclude with certainty that the Legacy Park project will make no contribution to any groundwater mounding impacts."

We agree with City's position. The final EIR establishes that the project will not create new groundwater impacts on the site. Rather, it will reduce the groundwater impact resulting from percolation of treated wastewater from the Lumber Yard project by using that water for controlled irrigation 10 months of the year. Under these circumstances, no cumulative analysis of groundwater impacts was required.

In summary, the record before us demonstrates that the net effect of the Legacy Park project will be to improve, rather than harm the environment. It will collect, treat, and use stormwater in a controlled manner, reducing discharge of untreated stormwater to Malibu Creek, Malibu Lagoon, and Surfrider Beach. The dispersal of treated wastewater from the Lumber Yard project to the Legacy Park site will be greatly reduced by using it for irrigation of vegetation at the park for all but the two rainiest months of the year. City had hoped to do even better, but investigation of the percolation capacity of the park site led City to conclude it could not be used as originally envisioned also to treat wastewater. We find no abuse of discretion in the City's conclusion that, even though the project did not meet all water quality goals for the Civic Center area, it is a significant improvement over existing conditions.

## DISPOSITION

The judgment is affirmed. Each side is to bear its own costs on appeal.

Manella, J., and Suzukawa, J., concurred.