Filed 7/8/14  Save Atascadero v. City of Atascadero CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX


| | |
|---|---|
| SAVE ATASCADERO,<br><br>  Plaintiff and Appellant,<br><br>v.<br><br>CITY OF ATASCADERO,<br><br>  Defendant and Respondent. | 2d Civil No. B250126<br>(Super. Ct. No. CV128230)<br>(San Luis Obispo County) |


Save Atascadero (Save) appeals a judgment denying its petition for writ of mandate.  Save challenges the City of Atascadero's (the City's) decision to approve the Del Rio Commercial Area Specific Plan.  Save contends the City did not proceed in the manner required by law because its environmental impact report (EIR):  (1) did not timely disclose modeling data for an agency's screening analysis of "Type B" health risks upon which the City relied, (2) did not adequately analyze the cumulative impact of toxic air emissions from the project or compare them with emissions from other projects in the area, and (3) did not recirculate a draft EIR with supplemental "Type A" health risk assessment data and Type B modeling data.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On June 26, 2012, the City Council for the City adopted resolutions to certify a final EIR for the Del Rio Road Commercial Area Specific Plan, amend the General Plan, and adopt a Specific Plan Master Plan of Development for the Del Rio

Commercial Area (the project).  The specific plan guides the development of about 40 acres of land on two non-contiguous parcels at the intersection of El Camino Real and Del Rio Road.  The land is currently vacant in a low-density residential area.  Highway 101 and a gas station are nearby.  The existing toxic air contaminant level in Atascadero is high.

The project has two components.  The "Wal-Mart" component has a development potential of 139,560 square feet on 26 acres, including a Wal-Mart store and 50 homes.  The "Annex" component has a development potential of 120,900 square feet of commercial uses and six homes on 13 acres.  The parcels are near Highway 101 and a gas station.

As lead agency, the City consulted with responsible agencies and trustee agencies interested in resources affected by the project and determined an EIR should be prepared pursuant to the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.)  It retained a consultant to do so.

Diesel particulate matter is a carcinogen, and was the toxic air contaminant of primary concern to the City in its environmental review.  The final EIR concluded that health risks from exposure to toxic air contaminants generated by the project were not significant.  Save does not challenge the adequacy of that conclusion, or the scope or methodology of the analysis that led to it.  It contends the contents of the draft and final EIRs were deficient and therefore the City did not proceed in the manner required by law.

*2011 Draft EIR*

The City circulated its first draft EIR in 2011 (2011 draft EIR).  It included a health risk assessment that considered the impact of new diesel emissions from the project on sensitive receptors (people) in the area, including people who would live off site and people who would live in the new residential units.  ("Type A" health risks.)  It did not discuss the impact on new project residents of existing sources of diesel emissions from a nearby highway and a gas station.  ("Type B" health risks.)

The Type A analysis reported that the project's diesel truck deliveries could expose existing "sensitive receptors" such as "[e]xisting residences and schools in the

vicinity" to "elevated levels of particulate matter on a recurring basis."  But it concluded the health risk of exposure was not significant because the excess cancer risks associated with the operation of the project are not expected to exceed the level of 10 in a million at any nearby sensitive receptor.

The draft used the cancer risk significance threshold of 10 excess cancer cases per million people that the San Luis Obispo Air Pollution Control District (Air District) adopted for determining when Type A potential air pollutant emissions of a proposed project are "significant" and therefore require a "risk assessment to determine the potential level of risk associated with their operations" in an EIR.  (San Luis Obispo Air Pollution Control District CEQA Air Quality Handbook, § 3.5.1, pp. 3-5, "the Air District CEQA handbook).)  Save does not challenge the validity of the Air District's significance thresholds.

*Comments on 2011 Draft EIR*

The Air District reviewed and commented on the 2011 Draft EIR.  It pointed out that the draft EIR only assessed Type A health risks (from project emissions) and did not assess Type B (risks to the project's future residents from existing toxic sources in the area).  It asked the City to expand Type A assessment to consider all diesel vehicles at the project, not just delivery trucks.

The Air District did not ask the City to analyze Type B risks.  The Air District conducted its own "screening analysis" to determine whether Type B risks are significant, and found they are not.  The screening analysis is a low level analysis using very conservative assumptions and is used to determine whether detailed study is warranted.  The Air District did not provide (or preserve) the spreadsheet of computer modeling output data that supported its screening analysis.  It did summarize its findings in its comment letter.  It explained that it considered the "three toxic sources within 1,000 feet of the proposed project: 1) Highway 101, 2) Golden Gate Shell, and 3) diesel traffic attracted to the proposed project" and determined the risk to project residents from these sources to be 49 excess cancer cases per million people, below its adopted significance threshold of 89 excess cancer cases per million people for Type B health risks.

3

The City revised the draft EIR in 2012 (2012 draft EIR) and recirculated it because of significant changes to the project that were unrelated to the issues on appeal. The revised draft incorporated responses to the Air District's comments with a revised Type A assessment.

The revised Type A assessment considered all diesel vehicles at the project, not just delivery trucks. This resulted in a slightly increased Type A cancer risk but the risk remained below the significance threshold of 10 excess cancer cases per million people.

The 2012 draft EIR also summarized the Air District's finding that the "Type B" risk would not be significant. It did not include the Air District's modeling data. It did summarize the Air District's findings, using the language of the Air District's comment letter.

The 2012 draft EIR discussed various cumulative impacts of the proposed project with other projects, such as aesthetics, cultural impacts, and air quality. The air quality discussion addressed cumulative carbon monoxide impacts and greenhouse gas emissions, but did not address diesel particulate matter. It reported that out of all the proposed or approved projects identified, none were within one mile of the project site. The Air District's CEQA handbook advises that "A cumulative impact analysis should be performed to evaluate the combined air quality impacts of this project and impacts from existing and proposed future development in the area. This should encompass all planned construction activities within one mile of the project."

*Comments on 2012 Draft EIR*

The Air District commented favorably on the 2012 Draft EIR's health risk assessment. It "agree[d] with the conclusions of acceptable risk." Save Atascadero also commented on the 2012 draft EIR. It asked for the factual basis for the new vehicle estimates underlying the expanded Type A assessment. It also asked that the draft EIR be "revised to include" the Air District's Type B screening assessment to allow the public to comment on it and verify its accuracy. Save also asked that the draft EIR be "revised to

provide an assessment of the cumulative impacts of [toxic air contaminants on] sensitive receptors in the Project vicinity."

*Final EIR*

The Final EIR included the City's responses to Save's comments. In response to the request for the factual basis underlying the revised Type A assessment, it included the underlying data as "Appendix Q" and responded that, since the revised assessment "reaffirmed the original conclusion . . . that no significant impacts would occur, this does not constitute a material omission of information such that recirculating the [draft EIR] would be necessary."

In response to Save's request to include the Air District's Type B screening assessment, the City stated that the assessment was performed in house by the Air District, as summarized in the draft EIR. It stated that "[g]iven the conclusion of the Type B Health Risk Assessment, the [Air District's] comment was simply a declarative statement, for which no response was necessary. The [Air District's] comment regarding the Type B Health Risk Assessment was noted in the [2012 draft EIR]."

In response to Save's request for an analysis of cumulative impacts of toxic air contaminants, the City stated that the Air District's handbook calls for "preparation of Type A and Type B Health Risk Assessments, such as the ones prepared for the proposed project. The Type B analysis addresses the impacts of existing sources of emissions and the project on sensitive receptors. There are no other planned or future projects in the area that would contribute additional cumulative impacts; therefore, the analysis adequately discloses the impacts of all potential sources."

*Comments on Final EIR after Close of Comment Period*

After the period for public comment on the Final EIR closed, and one day before the Planning Commission's June 5, 2012 hearing on it, Save submitted a comment letter in which it asserted the EIR should be recirculated with the new Appendix Q for the Type A analysis and with the Air District's Type B analysis. Save asserted the EIR lacked an adequate analysis of cumulative impacts of toxic air contaminants and that, to the extent the City relied on the Type B assessment to determine cumulative impacts, the

5

underlying data should have been disclosed so the public could verify it.  Save questioned whether the City had ever reviewed the underlying data.

The Planning Commission voted to recommend approval of the EIR.  The City's hearing was set for June 26, 2012.

On June 13, the City exercised its discretion to respond to Save's late comment letter.  The City's consultant wrote, in a memo to the city council, that CEQA did not require recirculation because there was no new significant information.  The memo explained that the Air District did not preserve the modeling output for the Type B screening analysis.  It stated that, at the consultant's request in June, the Air District re-ran a Type B screening analysis (this time including all diesel vehicles) and provided the modeling output data.  The City incorporated that new data into its response in Appendix Q.  It did not recirculate.  The Type B results were again below the significance threshold of 89 excess cancer cases per million people.  The risk was 53.5 per million with the additional diesel vehicles.  The memo is included in the public record.

After Save received the memo, it retained an air quality expert.  The expert reviewed the new Type B modeling output, and on June 22, submitted a comment letter offering the opinion that the Type B analysis did not constitute an adequate cumulative impact analysis because it did not consider impacts to off-site receptors and did not consider future highway traffic generated by the project.  The expert reported that there is already a significant cumulative health risk to off-site receptors in the area that exposes those who live between the proposed project site and Highway 101 to a health risk greater than 89 excess cancer cases per million people.  In the expert's opinion, the project's toxic air contaminant concentrations would contribute considerably to the cumulative risk.

The City's consultant responded, in another by memo to the city council, that the Type A and Type B assessments together adequately considered all cumulative impacts to off-site and on-site receptors.  On June 26, the City approved the EIR and passed resolutions with the necessary findings and approvals.

6

DISCUSSION

*Standard of Review*

The adoption of a specific plan is a quasi-legislative act. (*Yost v. Thomas* (1984) 36 Cal.3d 561, 570.) Our review concerns whether there was a prejudicial abuse of discretion. (Pub. Resources Code, § 21168.5.) Abuse is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426-427.) We review an EIR's content to determine whether it was prepared in the "manner required by law" (*id*. at p. 427), and we review its conclusions to determine whether they are supported by substantial evidence. (*Id.* at p.435.) Save challenges the EIR's content on the ground it omits information required by CEQA. It does not however, challenge the conclusions, findings, or methods used in the report. Nor does it complain that the report is not supported by substantial evidence.

We therefore consider only whether the City failed to conduct its CEQA review in the manner required by law by omitting prejudicial information. "When the specific claim of legal error concerns an omission of required information from the EIR, the plaintiff must demonstrate that (1) the EIR did not contain information required by law and (2) the omission precluded informed decisionmaking by the lead agency or informed participation by the public. (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 987.)

An EIR is an informational document, designed to inform public agency decisionmakers and the public generally of the "significant environmental effects of a project." (Cal. Code. Regs., tit. 14, § 15121, subd. (a).) It "should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences." (*Id*., § 15151.) "The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." (*Ibid.*) The EIR does not control the agency's decisions about the project, but the agency "must respond to each

7

significant effect identified in the EIR" (*id.*, § 15121, subd. (b)) by considering, discussing, and making findings about mitigation measures, supported by substantial evidence in the record. (*Id.,* §§ 15091, 15126.4.) Significant environmental effects of a proposed project may include the "effect of attracting people to the location and exposing them to the hazards found there. (*Id.,* § 15126.2, subd. (a).)

But the EIR's analysis should be limited to significant effects. A "significant effect" is a "substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by a project." (Cal. Code. Regs., tit. 14, § 15382.) To determine whether an effect is significant, the lead agency must use its "careful judgment," supported by substantial evidence, based "to the extent possible on scientific and factual data." (*Id.,* § 15064, subd. (b).)

No detailed analysis is required for an insignificant effect. (Pub.Resources Code, § 21003, subd. (c), Cal. Code. Regs., tit. 14, §§ 15128, 15143.) The EIR must "consider and resolve every fair argument that can be made about the possible significant environmental effects of a project." (*Protect Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1109.) But the EIR need only "contain a statement briefly indicating the reasons that various possible significant effects of a project were determined not to be significant and were therefore not discussed in detail in the EIR." (*Id.*, § 15128.)

The City proceeded in the manner required by law when its 2012 draft EIR summarized the Air District's comment letter with the explanation that its screening analysis indicated Type B risks were not significant. A lead agency should consult with interested agencies to identify potentially significant environmental effects, as the City did. (Cal. Code Regs., tit. 14, § 15086, subd. (a).) The agency with expertise in air quality advised the City that Type B health risks were not significant. CEQA requires public agencies like the Air District to "make substantive comments" regarding the activities within their area of expertise." (*Id.,* subd. (c).) If the agency "identifie[s] what the agency considers to be significant environmental effects [it] shall advise the lead agency of those effects." (*Id.*, subd. (d).) The Air District did not identify a significant

8

Type B effect.  The City was entitled to presume the Air District regularly performed its official duties.  (Evid. Code, § 664.)  To determine whether there is a significant environmental impact requiring further study, the Air District has adopted a CEQA health risk threshold of 89 excess cancer cases per million people for "Type B" projects, which it defines as "new land use projects that will place sensitive receptors (e.g. residential units) in close proximity to existing toxic sources (e.g. freeway)."  (APCD Handbook, Section 3.5.1, pp. 3-6.)  A lead agency may, when adopting a threshold of significance, consider thresholds of significance recommended by other public agencies.  (Cal. Code Regs., tit. 14, § 15064.7, subd. (c).)

Save contends that, nevertheless, the City did not proceed in the manner required by law because it should have produced the modeling data in response to Save's request in its comment letter.  A lead agency must respond to any comments received during the noticed comment period.  (Cal. Code Regs., tit. 14, § 15088. subd. (a).)  Written responses must "describe the disposition of significant environmental issues raised" and "address[] in detail" any "major environmental issues raised when the lead agency's position is at variance" with the comments, providing a "good faith, reasoned analysis in response."  (*Id*., subd. (c).)  "Conclusory statements unsupported by factual information will not suffice."  (*Ibid.*)  Save's comment letter did not raise a major environmental issue.  It requested the data the Air District used to determine there was no potentially significant Type B risk.  A lead agency "need only respond to significant environmental issues and do[es] not need to provide all information requested by reviewers, as long as a good faith effort at full disclosure is made in the EIR."  (*Id.,* § 15204, subd. (a).)  The City's response was a good faith effort to fully disclose the information it relied on from the Air District, an expert commenting agency.  It did not have, and had not reviewed, the Air District's modeling data.

The City was not required to recirculate the 2012 draft EIR with Appendix Q and the Type B modeling data because neither represented "significant new information."  A lead agency must recirculate an EIR when "significant new information is added."  (Cal. Code Regs., tit. 14, § 15088.5, subd. (a).)  New information is

9

"significant" only if "the EIR is changed in a way that deprives the public of meaningful opportunity to comment upon a substantial adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect." (*Ibid.*) Recirculation is required if a disclosure shows that the EIR was so fundamentally inadequate and conclusory that meaningful public review and comment were precluded. (*Id.*, subd. (a)(4).) "Recirculation is not required where the new information added to the EIR merely clarifies or amplifies or makes insignificant modifications in an adequate EIR." (*Id.*, subd. (b).) Appendix A and the Type B modeling data merely clarified the 2012 draft EIR's conclusions that there were no significant Type A or Type B health effects. Recirculation was not required. Moreover, we review a decision not to recirculate an EIR for substantial evidence. (*Id.*, subd. (e).) Save disavows any challenge to the substantiality of the evidence to support the City's decisions concerning this project.

Save contends that, whether or not the Air District's Type B analysis was a screening assessment, it was a study relied on by the EIR and should have been disclosed. (Pub. Resources Code, §§ 21061, 21092, subd. (b)(1); Cal. Code Regs., tit. 14, §§ 15087,subd. (c)(5), 15050, subd. (b).) We disagree. A lead agency must make available to the public any information "cited [in the EIR] as the source for [its] conclusion[s]." (Pub. Resources Code, § 21061) and "all documents referenced in" the EIR. (*Id*, § 21092, subd. (b)(1).) The City did not rely on the Air District's modeling data. It relied upon the Air District's expertise in determining the threshold question whether study of Type B risks was warranted. The City made available to the public the source it relied on when it fully reported the contents of the Air District's letter on the subject. The Air District's modeling data was not a study relied on by the EIR.

The EIR did not omit discussion of cumulative health impacts; they were discussed in the Type A analysis and the Type B finding of no significance. An EIR must discuss cumulative impacts of a project when the project's incremental effect is cumulatively considerable. If the incremental effect is not cumulatively considerable, the agency "need not consider that effect as significant, but shall briefly describe its basis for concluding that the incremental effect is not cumulatively considerable." (Cal. Code

Regs., tit., § 15130, subd. (a).) The City proceeded in the manner required by law when it disclosed the reasons for finding that the project's toxic air contaminant impacts are not significant. It disclosed the existing elevated toxic contaminant levels in both draft EIRs. It analyzed the Type A impact of project emissions on sensitive receptors both on and off-site and found it not significant. ("[F]ifty-nine receptor locations were identified . . . where there are existing residences surrounding the proposed [project] or locations where there are planned residences within the residential parcels within the Wal-Mart Site and Annex Site.") It disclosed the Type B screening analysis which considered the combined impact of on and off-site emissions on project residents and found those not significant. The City did not omit analysis of cumulative impacts.

Save points out that its expert ultimately found the Type B and cumulative impact analysis lacking when he reviewed it in the week before the EIR was adopted. But "CEQA challenges concerning the amount or type of information contained in the EIR, the scope of the analysis, or the choice of methodology are factual determinations reviewed for substantial evidence." (*Santa Monica Baykeeper v. City of Malibu* (2011) 193 Cal.App.4th 1538, 1546.) Save asked us not to conduct a substantial evidence review. Even if we were to do so, we would conclude that substantial evidence in the record supports the City's factual determinations. Disagreement among experts alone does not render an EIR inadequate. (*Greenbaum v. Los Anagles* (1984) 153 Cal.App.3d 391, 412-413.)

The judgment is affirmed.

NOT TO BE PUBLISHED.


GILBERT, P.J.

We concur:


YEGAN, J.


PERREN, J.

11

Jac A. Crawford, Judge

Superior Court County of San Luis Obispo

_____

M. R. Wolfe & Associates, Mark R. Wolfe, John H. Farrow for Plaintiff and Appellant Save Atascadero.

Burke, Williams & Sorensen, Brian A. Pierik, Amy E. Hoyt for Defendant and Respondent City of Atascadero.

Gresham, Savage, Nolan & Tilden, John C. Nolan, Jonathan E. Shardlow for Real Party in Interest and Respondent Wal-Mart Stores, Inc.

Price, Postel & Parma, C.E. Chip Wullbrandt, Melissa J. Fassett for Real Party in Interest and Respondent Montecito Bank & Trust.

Alston & Bird, Nicki Carlsen for Real Party in Interest and Respondent The Rottman Group.